CLAY, J., delivered the opinion of the court, in which HOOD, D.J., joined. WHITE, J. (pp. 487-43), delivered a separate opinion concurring in part and dissenting in part.
OPINION
CLAY, Circuit Judge.
Defendants Jon Husted, the Secretary of State of Ohio, and Mike DeWine, the Attorney General of Ohio (collectively the “State”), joined by Intervenors representing numerous military service associations (“Intervenors”), appeal from the district court’s order granting Plaintiffs’ motion for a preliminary injunction. The district court enjoined the State from enforcing Ohio Rev. Code § 3509.03 to the extent that it prevents some Ohio voters from casting in-person early ballots during the three days before the November 2012 election on the basis that the statute violates the Equal Protection Clause of the Fourteenth Amendment. For the reasons set forth below, we AFFIRM the district court’s order granting the preliminary injunction.
BACKGROUND
I. Procedural History
On July 17, 2012, Plaintiffs Obama for America, the Democratic National Committee, and the Ohio Democratic Party filed a complaint in district court against Jon Husted, in his official capacity as Secretary of State of Ohio, and Mike DeWine, in his official capacity as Attorney General of Ohio. Plaintiffs alleged that Ohio Rev. Code § 3509.03 was unconstitutional insofar as it imposes on non-military voters a deadline of 6:00 p.m. on the Friday before Election Day for in-person early voting.[1] On the same day, Plaintiffs moved for a preliminary injunction preventing the statute’s enforcement. They argued that the relevant statutory provisions “burden the fundamental right to vote but are not necessary to any sufficiently weighty state interest.” (R. 2, at 2.)
On August 1, 2012, numerous military service associations filed a motion to intervene, and the district court granted the motion. The State and Intervenors opposed Plaintiffs’ motion for a preliminary injunction. They argued that the State’s interest in providing military voters with added in-person early voting time and the burden on local boards of elections of providing that same extra time for all voters justified imposing a different deadline on military and overseas voters than all other voters.
The district court conducted a hearing on Plaintiffs’ motion on August 15, 2012. The parties filed numerous exhibits, in- *426 eluding legislative history, declarations of career military officers and voting experts, and statistical and demographic studies by various governmental agencies and nongovernmental organizations. On August 31, 2012, the district court issued an opinion and order granting Plaintiffs’ motion for a preliminary injunction. The district court concluded that § 3509.03 violated the Equal Protection Clause to the extent that it set a different in-person early voting deadline for non-military voters because “the State’s interests are insufficiently weighty to justify the injury to Plaintiffs.” — F.Supp.2d -, -, No. 2:12-cv-00636, 2012 WL 3765060, at *10 (S.D.Ohio Aug. 31, 2012). The district court enjoined the enforcement of § 3509.03 and ordered that in-person early voting be available to non-military voters on the same terms as before the enactment of Amended Substitute House Bill 224 and Substitute Senate Bill 295. Id. at -, 2012 WL 3765060, at *22-23. The preliminary injunction ensures that all Ohio voters — military, overseas, and nonmilitary — are afforded the same opportunity for in-person early voting that was available to them prior to the enactment of § 3509.03.
The State and Intervenors now appeal the district court’s order granting a preliminary injunction. On September 12, 2012, the district court denied the State’s motion to stay its order pending appeal, and the preliminary injunction remains in effect.
II. Facts
A. In-Person Early Voting in Ohio
Ohio introduced in-person early voting largely in response to the myriad problems faced by voters during the 2004 election. During that election, Ohio voters faced long lines and wait-times that, at some polling places, stretched into the early morning of the following day. To prevent similar problems from disenfranchising voters in the future and to ease the strain of accommodating all voters on a single day, the State established no-fault absentee voting in October 2005. The new rules eliminated the need for absentee voters to have an excuse for not voting on election day. See 2005 Ohio Laws 40 (Sub. H.B. 234). After the creation of in-person early voting, any registered voter could cast an absentee ballot at the appropriate board of elections office through the Monday before the election. See id. (amending Ohio Rev. Code §§ 3509.02-3509.04).
The evidence considered by the district court showed that a large number of Ohio voters chose to utilize the new early voting procedures in elections from 2006 through 2010. Early voting peaked during the 2008 election, when approximately 1.7 million Ohioans cast their ballots before election day, amounting to 20.7% of registered voters and 29.7% of the total votes cast. In Ohio’s twelve largest counties, approximately 340,000 voters, or about 9% of the total votes cast in those counties, chose to vote early at a local board of elections office. Using data from seven of Ohio’s largest counties, one study projected that, in 2008, approximately 105,000 Ohioans cast their ballots in person during the final three days before the election. In 2010, approximately 1 million Ohioans voted early, and 17.8% of them chose to cast their ballots in person. In a poll conducted after the 2010 election, 29.6% of early voters reported voting within one week of election day.
Voters who chose to cast their ballots early tended to be members of different demographic groups than those who voted on election day. Early voters were “more likely than election-day voters to be women, older, and of lower income and education attainment.” (R. 34-31, Pis.’ Ex. 27, *427 at 1.) Data from Cuyahoga and Franklin Counties suggests that early voters were disproportionately African-American and that a large majority of early in-person votes (82% in Franklin County) were cast after hours on weekdays, on the weekend, or on the Monday before the election.
B. Legislative Changes to In-Person Early Voting
On July 1, 2011, Ohio Governor John Kasich signed Amended Substitute House Bill 194, an omnibus bill that made broad changes to Ohio election law. Among other things, the Ohio legislature apparently intended to change the deadlines for in-person early voting from the Monday before the election to 6:00 p.m. on the Friday before the election. Instead, H.B. 194 created two separate and contradictory deadlines: one on Friday and one on Monday. For non-military voters, Ohio Rev.Code § 3509.03 contained the former Monday deadline, but an amended § 3509.01 imposed the new Friday deadline. Military and overseas voters found themselves in much the same position, with § 3511.02 containing the former deadline, and an amended § 3511.10 containing the new one.
In an attempt to correct its mistake, the Ohio General Assembly passed Amended Substitute House Bill 224, which became effective on October 27, 2011. H.B. 224 fixed the inconsistent deadlines in § 3509.03 and § 3511.02, changing the deadlines for all voters to 6:00 p.m. on the Friday before the election. Before the technical corrections in H.B. 224 could take effect, however, a petition with more than 300,000 signatures was filed to put the omnibus election law, H.B. 194, to a referendum. The referendum petition was certified by the Secretary of State on December 9, 2011, and pursuant to the Ohio Constitution, the implementation of H.B. 194 was suspended for the 2012 election cycle.
On May 8, 2012, the General Assembly repealed the then-suspended H.B. 194 through Substitute Senate Bill 295. However, neither the organizers of the referendum petition nor the Ohio legislature thought to attack or repeal the bill containing the technical changes, H.B. 224, which remained in effect. Therefore, even though the original bill, H.B. 194, was repealed, the technical changes contained in H.B. 224 remained in place, and Ohio voters were still left with inconsistent deadlines. Nonmilitary voters could cast ballots in-person until 6:00 p.m. on the Friday before the election. But military and overseas voters had two deadlines: Friday at 6:00 p.m. pursuant to § 3511.02, and the close of the polls on election day pursuant to § 3511.10.
In order to correct this confusion, Defendant Husted construed the statute to apply the more generous deadline contained in § 3511.10 to military and overseas voters. Attempts by local boards of elections to provide in-person early voting to non-military voters through the Monday before the election were denied by the Secretary of State on the grounds that the statute does not permit it. On August 15, 2012, Defendant Husted issued Directive 2012-35, instructing the local boards of election that they were to maintain regular business hours between October 2, 2012 and November 2, 2012. This directive eliminated the local boards’ discretion to be open on weekends during that period. Between October 2, 2012 and October 19, 2012, the boards must close at 5:00 p.m. During the last two weeks of the election, the boards will remain open until 7:00 p.m. but may not remain open afterwards or on the weekends. The directive does not address office hours on the final three-day period before Election Day, when, according to the statute, only military and overseas voters can cast ballots in person.
*428 DISCUSSION
I. Standard of Review
We review a district court’s grant of a preliminary injunction for an abuse of discretion. Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati, 363 F.3d 427, 432 (6th Cir.2004). While the ultimate decision to grant or deny a preliminary injunction is reviewed for an abuse of discretion, we review the district court’s legal conclusions de novo and its factual findings for clear error. Hunter v. Hamilton Cnty. Bd. of Elections, 635 F.3d 219, 233 (6th Cir.2011). “This standard of review is ‘highly deferential’ to the district court’s decision.” Id. (quoting Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 541 (6th Cir.2007)). “The injunction will seldom be disturbed unless the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.” Mascio v. Pub. Emps. Ret. Sys. of Ohio, 160 F.3d 310, 312 (6th Cir.1998).
“A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.” Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The district court’s determination that a plaintiff is likely to succeed on the merits is a question of law that we review de novo. Hunter, 635 F.3d at 233.
II. Likelihood of Succeed on the Merits
A. Equal Protection in the Voting Context
The right to vote is a “precious” and “fundamental” right. Harper v. Va. State Bd. of Elections, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). “Other rights, even the most basic, are illusory if the right to vote is undermined.” Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); see also Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (finding that the right to vote is “preservative of all rights”). “ ‘The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.’ ” League of Women Voters v. Brunner, 548 F.3d 463, 477 (6th Cir.2008) (quoting Bush v. Gore, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)). “[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.” Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). “Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person’s vote over that of another.” Bush, 531 U.S. at 104-05, 121 S.Ct. 525; see also Wesberry, 376 U.S. at 17, 84 S.Ct. 526 (“Our Constitution leaves no room for classification of people in a way that unnecessarily abridges [the right to vote.]”).
The Equal Protection Clause applies when a state either classifies voters in disparate ways, see Bush, 531 U.S. at 104-05, 121 S.Ct. 525 (arbitrary and disparate treatment of votes violates equal protection), or places restrictions on the right to vote, see League of Women Voters, 548 F.3d at 478 (voting system that burdens the exercise of the right to vote violates equal protection). The precise character of the state’s action and the nature of the burden on voters will determine the appropriate equal protection standard. See *429 Biener v. Calio, 361 F.3d 206, 214 (3d Cir.2004) (“The scrutiny test depends on the [regulation’s] effect on [the plaintiff’s] rights.”).
If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used. See McDonald v. Bd. of Election Comm’rs, 394 U.S. 802, 807-09, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969) (applying rational basis to a state statute that prohibited plaintiffs’ access to absentee ballots where no burden on the right to vote was shown); Biener, 361 F.3d at 214-15 (applying rational basis where there was no showing of an “infringement on the fundamental right to vote”). On the other extreme, when a state’s classification “severely” burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard. Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); see also Harper, 383 U.S. at 670, 86 S.Ct. 1079 (“We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.”).
Most cases fall in between these two extremes. When a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, we review the claim using the “flexible standard” outlined in Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). See Hunter, 635 F.3d at 238 (applying Anderson-Burdick balancing in an equal protection challenge to the counting of provisional ballots). Although Anderson and Burdick were both ballot-access cases, the Supreme Court has confirmed their vitality in a much broader range of voting rights contexts. See Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 204, 128 S.Ct. 1610, 170 L.Ed.2d 574 (Scalia, J., concurring.) (“To evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in Burdick.... ”). The Burdick Court stated the standard as follows:
A court considering a challenge to a state election law must weigh “the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate” against “the precise interests put forward by the State as justifications for the burden imposed by its rule,” taking into consideration “the extent to which those interests make it necessary to burden the plaintiffs’ rights.”
Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (quoting Anderson, 460 U.S. at 789, 103 S.Ct. 1564). This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote. There is no “litmus test” to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state’s asserted justifications and “make the ‘hard judgment’ that our adversary system demands.” Crawford, 553 U.S. at 190, 128 S.Ct. 1610 (Stevens, J., announcing the judgment of the Court).
The district court applied the Anderson-Burdick standard and ultimately concluded that the justifications proffered by the State were insufficient to outweigh the burden on Plaintiffs’ voting rights. Instead of the Anderson-Burdick standard, the State and Intervenors urge *430 us to apply a rational basis standard of review to the early voting restriction at issue. Because Plaintiffs’ complaint alleges a straightforward equal protection violation, they argue, a straightforward equal protection analysis should follow. However, when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the Anderson-Burdick standard applies. See Hunter, 635 F.3d at 238; see also Clements v. Fashing, 457 U.S. 957, 965, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (rejecting the assertion that traditional equal protection principles should automatically apply in the voting rights context “without first examining the nature of the interests that are affected and the extent of the burden”).
The State and Intervenors argue that the Anderson-Burdick standard is applicable only when a state regulation is alleged to have violated the free association and due process guarantees of the First and Fourteenth Amendments, not when a plaintiff alleges only an equal protection violation. The State seeks to disconnect and isolate these areas of constitutional law as they apply to voting rights, but its approach would create inflexible doctrinal silos. The Supreme Court in Anderson explicitly imported the analysis used in equal protection cases to evaluate voting rights challenges brought under the First Amendment, see Anderson, 460 U.S. at 786 n. 7, 103 S.Ct. 1564, thus creating a single standard for evaluating challenges to voting restrictions.[2] The Supreme Court confirmed this approach in Crawford by directly connecting its equal protection voting rights jurisprudence in Harper v. Va. State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), with Anderson and Burdick, and finally applying the standard derived from those cases to a state statute allegedly burdening the right to vote. See Crawford, 553 U.S. 181, 189-91, 128 S.Ct. 1610. Plaintiffs have demonstrated that their right to vote is unjustifiably burdened by the changes in Ohio’s early voting regime.[3] The Anderson-Burdick standard therefore applies.
The State relies heavily on McDonald v. Bd. of Election Comm’rs, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), for the proposition that rational basis is the appropriate standard when a state denies absentee ballots to some citizens and not others. In McDonald, unsentenced Illinois inmates were denied access to absentee ballots because they were not among the categories of voters that were provided those ballots under Illinois law. Id. at 803, 89 S.Ct. *431 1404. The Court applied a rational basis standard of review, reasoning that the state had not classified the inmates based on race or wealth, nor was there any evidence “in the record to indicate that the Illinois statutory scheme has an impact on appellants’ ability to exercise the fundamental right to vote.” Id. at 807, 89 S.Ct. 1404. The Court found no fundamental right to receive an absentee ballot as such, and stated, “[W]e cannot lightly assume, with nothing in the record to support such an assumption, that Illinois has in fact precluded appellants from voting.” Id. at 808, 89 S.Ct. 1404. The McDonald plaintiffs failed to make out a claim for heightened scrutiny because they had presented no evidence to support their allegation that they were being prevented from voting. See O’Brien v. Skinner, 414 U.S. 524, 529, 94 S.Ct. 740, 38 L.Ed.2d 702 (1974) (“Essentially the Court’s disposition of the claims in McDonald rested on failure of proof.”); Goosby v. Osser, 409 U.S. 512, 520-22, 93 S.Ct. 854, 35 L.Ed.2d 36 (finding that McDonald itself suggested a different result if plaintiffs had presented evidence that the state was effectively preventing them from voting).
On the contrary, Plaintiffs introduced extensive evidence that a significant number of Ohio voters will in fact be precluded from voting without the additional three days of in-person early voting. (See, e.g., R. 34-32, Pis.’ Ex. 28, at 2.) The district court credited statistical studies that estimated approximately 100,000 Ohio voters would choose to vote during the three-day period before Election Day, and that these voters are disproportionately “women, older, and of lower income and education attainment.” — F.Supp.2d at-, 2012 WL 3765060, at *3. The district court concluded that the burden on Plaintiffs was “particularly high” because their members, supporters, and constituents represent a large percentage of those who participated in early voting in past elections. Id. at -, 2012 WL 3765060, at *15. The State did not dispute the evidence presented by Plaintiffs, nor did it offer any evidence to contradict the district court’s findings of fact. Id. Plaintiffs did not need to show that they were legally prohibited from voting, but only that “burdened voters have few alternate means of access to the ballot.” Citizens for Legislative Choice v. Miller, 144 F.3d 916, 921 (6th Cir.1998) (citing Burdick, 504 U.S. at 436-37, 112 S.Ct. 2059).
The State argues that the burden on non-military voters is slight because they have “ample” other means to cast their ballots, including by requesting and mailing an absentee ballot, voting in person prior to the final weekend before Election Day, or on Election Day itself. However, the district court concluded that because early voters have disproportionately lower incomes and less education than election day voters, and because all evening and weekend voting hours prior to the final weekend were eliminated by Directive 2012-35, “thousands of voters who would have voted during those three days will not be able to exercise their right to cast a vote in person.” — F.Supp.2d at -, 2012 WL 3765060, at *7. Based on the evidence in the record, this conclusion was not clearly erroneous. Because the district court found that Plaintiffs’ right to vote was burdened, it properly applied the Anderson-Burdick standard.[4] Therefore, *432 if Plaintiffs can show that the State’s burden on their voting rights is not sufficiently justified, they are likely to succeed on their claim that the State has violated the Equal Protection Clause.
B. Ohio’s Justifications
The State offers two justifications for eliminating in-person early voting for nonmilitary voters during the three days before Election Day. First, it asserts that local county boards of elections are too busy preparing for Election Day to accommodate early voters after 6:00 p.m. on the Friday before the election. Second, the State claims that the unique challenges faced by military service members and their families justify maintaining in-person early voting for them but not for other Ohio voters.
The State correctly argues that its two justifications are relevant to two separate aspects of the equal protection analysis: the first justification — the burden on local boards of elections — should be considered in relation to the State’s restriction of voting rights, while the second justification— the need to accommodate military voters and their families — should be considered in relation to the State’s disparate treatment of military and non-military voters. See State’s Br. 46 n.3. These two strands are part of the same equal protection analysis. If the State merely placed “nonsevere, nondiscriminatory restrictions” on all voters, the restrictions would survive if they could be sufficiently justified. See Crawford, 553 U.S. at 190, 128 S.Ct. 1610 (discussing the application of the AndersonBurdick standard to “reasonable, nondiscriminatory restrictions”). On the other hand, if the State merely classified voters disparately but placed no restrictions on their right to vote, the classification would survive if it had a rational basis. See McDonald, 394 U.S. at 807-09, 89 S.Ct. 1404 (applying rational basis review where no burden on the right to vote was shown). However, the State has done both; it has classified voters disparately and has burdened their right to vote. Therefore, both justifications proffered by the State must be examined to determine whether the challenged statutory scheme violates equal protection. We will address each proposed justification in turn.
1. Burden on Local Boards of Elections
The State contends that halting in-person early voting at 6:00 p.m. on the Friday before the election is necessary to give local county boards of elections enough time to prepare for Election Day. The State introduced the affidavit of Deputy Assistant Secretary of State Matthew Damschroder, who explained the myriad tasks that the boards must complete during the Saturday, Sunday, and Monday before the election. Among these duties are: (1) validating, scanning, and tabulating absentee ballots that have been cast in-person or received by mail prior to the final weekend, (2) securing all the necessary ballots, instruction cards, registration forms, and other materials for use by voters, (3) ensuring that each polling place has the proper voting equipment, tables, chairs, and signs, (4) ensuring that each polling place is accessible and making any temporary improvements that are necessary, such as installing ramps, (5) preparing the official lists of registered voters, including notations for those voters who have already requested absentee ballots, and (6) handling any last-minute issues that arise, including moving polling places and replacing poll workers who are suddenly unable to serve. (See R. 35-9, Defs.’ Ex. 8, at 3.)
Granted, the list of responsibilities of the boards of elections is long, and the staff *433 and volunteers who prepare for and administer elections undoubtedly have much to accomplish during the final few days before the election. But the State has shown no evidence indicating how this election will be more onerous than the numerous other elections that have been successfully administered in Ohio since early voting was put into place in 2005. During that time, the Ohio boards of elections have effectively conducted a presidential election and a gubernatorial election, not to mention many other statewide and local elections, all while simultaneously handling in-person early voting during the three days prior to the election. The State has not shown that any problems arose as a result of the added responsibilities of administering early voting, and in fact, it seems that one of the primary motivations behind instituting early voting was to relieve local boards of the strain caused by all voters casting their ballots on a single day. See League of Women Voters, 548 F.3d at 477-78 (describing the many problems faced by voters during the November 2004 election in Ohio, including extremely long lines and wait-times on Election Day).
The district court considered evidence from several of Ohio’s counties that contradicts the State’s assertions. Ohio’s most populous county, Cuyahoga County, asserted that maintaining in-person early voting would actually alleviate some of its burden by spreading out the demand for voting over more days, thus reducing lines and wait times at polling places on Election Day. Further evidence showed that several more Ohio counties have already allocated funding for early voting, thus allaying concerns about the financial hardship that early voting might cause. While these counties cannot speak for all of Ohio’s counties, the State introduced no specific evidence to refute any of their assertions, nor has it suggested that the experience of these counties is unique.
Under the Anderson-Bwrdick standard, we must weigh “the character and magnitude of the asserted injury” against the “precise interests put forward by the State ... taking into consideration the extent to which those interests make it necessary to burden the plaintiffs rights.” Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (emphasis added). The State must propose an “interest sufficiently weighty to justify the limitation.” Norman v. Reed, 502 U.S. 279, 288-89, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992). The burden on Plaintiffs’ voting rights is surely real, as the district court found, but the elimination of in-person early voting during the three-day period prior to the election does not absolutely prohibit early voters from voting. However, because early voters tend to be members of demographic groups that may be unable to vote on Election Day or during the workday at local boards of elections because of work schedules, their ability to cast a ballot is impeded by Ohio’s statutory scheme.[6] The burden on non-military Ohio voters is not severe, but neither is it slight.
The State’s proffered interest in smooth election administration must be “sufficiently weighty” to justify the elimination of in-person early voting for non-military voters during the three-day period in question. If the State had enacted a generally applicable, nondiscriminatory voting regulation that limited in-person early voting for all *434 Ohio voters, its “important regulatory interests” would likely be sufficient to justify the restriction. See Burdick, 504 U.S. at 484, 112 S.Ct. 2059. However, Ohio’s statutory scheme is not generally applicable to all voters, nor is the State’s justification sufficiently “important” to excuse the discriminatory burden it has placed on some but not all Ohio voters. The State advances only a vague interest in the smooth functioning of local boards of elections. The State simply indicates that allowing in-person early voting, as was done in the past, “could make it much more difficult for the boards of elections to prepare for Election Day.” (R. 35-9, Defs.’ Ex. 8, at 3 (emphasis added).) With no evidence that local boards of elections have struggled to cope with early voting in the past, no evidence that they may struggle to do so during the November 2012 election, and faced with several of those very local boards in opposition to its claims, the State has not shown that its regulatory interest in smooth election administration is “important,” much less “sufficiently weighty” to justify the burden it has placed on nonmilitary Ohio voters.
2. Unique Challenges to Military Service Members and Their Families
The State’s asserted goal of accommodating the unique situation of members of the military, who may be called away at a moment’s notice in service to the nation, is certainly a worthy and commendable goal. However, while there is a compelling reason to provide more opportunities for military voters to cast their ballots, there is no corresponding satisfactory reason to prevent non-military voters from casting their ballots as well.
Federal and state law makes numerous exceptions and special accommodations for members of the military, within the voting context and without, and no one argues that these exceptions are somehow constitutionally suspect. By and large, these statutes and regulations — from UOCAVA and the MOVE Act to the Uniformed Services Employment and Reemployment Act — are based on highly relevant distinctions between service members and the civilian population, and they confer benefits accordingly. For example, UOCAVA’s accommodations for military and overseas voters are based almost entirely on the difficulties that arise from being physically located outside the United States. To address communication difficulties, Ohio law permits absent military and overseas voters to request an absentee ballot by mail, fax, email, or in person, while other voters may only do so by mail or in person. Ohio Rev.Code §§ 3509.03, 3509.05, 3511.04. To account for inconsistencies and delays in foreign mail systems, UOCAVA, as amended by the MOVE Act, requires states to provide absentee ballots to absent military and overseas voters at least 45 days prior to an election. 42 U.S.C. § 1973ff-l(a)(8). These special accommodations are tailored to address the problems that arise from being overseas.
Providing more time for military and overseas voters to cast their ballots in-person is not a response to the problem of these voters being absent, because absent voters obviously cannot cast ballots in person. Rather, the State argues that these voters need more time to vote early because they could be called away from the jurisdiction in an emergency with little notice. (See R. 35-8, Defs.’ Ex. 7; R. 35-10, Defs.’ Ex. 9.) We acknowledge the difficult circumstances of members of the military and their families, who constantly face the possibility of a sudden and unexpected deployment, and we admire their dedication and sacrifice. For that reason, Ohio’s commitment to providing as many opportunities as possible for service members *435 and their families to vote early is laudable. However, the State has offered no justification for not providing similarly situated voters those same opportunities. See S.S. v. E. Ky. Univ., 532 F.3d 445, 457 (6th Cir.2008) (“In essence, a State must ‘treat similarly situated individuals in a similar manner.’” (quoting Buchanan v. City of Bolivar, 99 F.3d 1352, 1360 (6th Cir. 1996))).
The State asserts that military and overseas voters are not similarly situated to other Ohio voters for equal protection purposes. “The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.” Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (emphasis added); see also Tri-Health, Inc. v. Bd. of Comm’rs, 430 F.3d 783, 790 (6th Cir.2005) (finding that two groups of hospitals were not similarly situated for equal protection purposes because “they differ[ed] in several material respects”). In many respects, absent military and overseas voters are not similarly situated to other Ohio voters. Typically, their absence from the country is the factor that makes them distinct, and this is reflected in the exceptions and special accommodations afforded to these voters under federal and state law.
With respect to in-person early voting, however, there is no relevant distinction between the two groups. The State argues that military voters need extra early voting time because they could be suddenly deployed. But any voter could be suddenly called away and prevented from voting on Election Day. At any time, personal contingencies like medical emergencies or sudden business trips could arise, and police officers, firefighters and other first responders could be suddenly called to serve at a moment’s notice. There is no reason to provide these voters with fewer opportunities to vote than military voters, particularly when there is no evidence that local boards of elections will be unable to cope with more early voters. While we readily acknowledge the need to provide military voters more time to vote, we see no corresponding justification for giving others less time.
The State and Intervenors worry about the logical extensions and practical implications of Plaintiffs’ position. If states are forced to provide the same accommodations to every voter that they currently provide to military and overseas voters, such as added flexibility and extra time, states may simply eliminate these special accommodations altogether. (See R. 35-10, Defs.’ Ex. 9, at 5.) However, virtually all of the special voting provisions in federal and Ohio law address problems that arise when military and overseas voters are absent from their voting jurisdictions. See Doe v. Walker, 746 F.Supp.2d 667, 670-71 (D.Md.2010) (describing the purpose of the MOVE Act as facilitating the receiving and sending of absentee ballots from overseas). They are not similarly situated to all other voters in this respect, and states are justified in accommodating their particular needs. With respect to in-person voting, the two groups are similarly situated, and the State has not shown that it would be burdensome to extend early voting to all voters. Its argument to the contrary is not borne out by the evidence. See supra Part II.B.l.
Equally worrisome would be the result if states were permitted to pick and choose among groups of similarly situated voters to dole out special voting privileges. Partisan state legislatures could give extra early voting time to groups that traditionally support the party in power and impose corresponding burdens on the other party’s core constituents. See Clingman *436 v. Beaver, 544 U.S. 581, 603, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (O’Connor, J., concurring) (“[Particularly where [voting restrictions] have discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition.”). To avoid this dangerous result, courts must carefully weigh the asserted injury against the “precise interests” proffered by the State. Burdick, 504 U.S. at 434, 112 S.Ct. 2059. Although the State argues that it has justifiably given more early voting time to military and overseas voters, in fact, the time available to those voters has not changed and will not be affected by the district court’s order. Rather, the State must show that its decision to reduce the early voting time of non-military voters is justified by a “sufficiently weighty” interest. The State has proposed no interest which would justify reducing the opportunity to vote by a considerable segment of the voting population.
Having found that neither interest proposed by the State is sufficient to justify the limitation on in-person early voting imposed on all non-military Ohio voters, we find that Plaintiffs are likely to succeed on their claim that Ohio Rev.Code § 3509.03, as implemented by the Ohio Secretary of State, violates the Equal Protection Clause.
III. Equitable Factors
When a party seeks a preliminary injunction on the basis of a potential constitutional violation, “the likelihood of success on the merits often will be the determinative factor.” Jones v. Caruso, 569 F.3d 258, 265 (6th Cir.2009). We have concluded that Plaintiffs are likely to succeed on the merits of their equal protection challenge, but we nevertheless address the remaining three factors of the preliminary injunction test. “A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.” Winter, 555 U.S. at 20, 129 S.Ct. 365. The equitable factors of the preliminary injunction test also weigh in favor of granting the preliminary injunction.
Plaintiffs, their members and constituents, and all non-military Ohio voters would be irreparably injured absent a preliminary injunction. “A plaintiffs harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.” Tenke Corp., 511 F.3d at 550. When constitutional rights are threatened or impaired, irreparable injury is presumed. See ACLU of Ky. v. McCreary County, Ky., 354 F.3d 438, 445 (6th Cir.2003). A restriction on the fundamental right to vote therefore constitutes irreparable injury. See Williams v. Salerno, 792 F.2d 323, 326 (2d Cir.1986) (finding that the denial of the right to vote is “irreparable harm”).
The balance of equities and the public interest also weigh in Plaintiffs favor. The burden on non-military Ohio voters’ ability to cast ballots, particularly when many of those voters will likely be unable to vote on Election Day or during the day at local boards of elections because of work schedules, outweighs any corresponding burden on the State, which has not shown that local boards will be unable to cope with three extra days of in-person early voting — as they have successfully done in past elections. While states have “a strong interest in their ability to enforce state election law requirements,” Hunter, 635 F.3d at 244, the public has a “strong interest in exercising the ‘fundamental political right’ to vote.” Purcell v. Gonzalez, *437 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (quoting Dunn, 405 U.S. at 336, 92 S.Ct. 995). “That interest is best served by favoring enfranchisement and ensuring that qualified voters’ exercise of their right to vote is successful.” Hunter, 635 F.3d at 244. The public interest therefore favors permitting as many qualified voters to vote as possible. Because the district court properly found that the equitable factors favor Plaintiffs, its decision to issue a preliminary injunction was appropriate.
IV. District Court’s Remedy
The State argues that the district court’s remedy was overbroad because it could be read to affirmatively require the State to mandate early voting hours during the three-day period prior to the election. We do not read the district court’s order in this way. The order clearly restores the status quo ante, returning discretion to local boards of elections to allow all Ohio voters to vote during Saturday, November 3, 2012; Sunday, November 4, 2012; and Monday, November 5, 2012. Because Ohio Rev.Code § 3509.03 is unconstitutional to the extent that it prohibits non-military voters from voting during this period, the State is enjoined from preventing those voters from participating in early voting. But the State is not affirmatively required to order the boards to be open for early voting. Under the district court’s order, the boards have discretion, just as they had before the enactment of § 3509.03. The district court’s remedy was therefore appropriate.
CONCLUSION
For the foregoing reasons, we AFFIRM the district court’s order granting a preliminary injunction.

. All references to the election or Election Day refer to the November 6, 2012 election. The three-day period prior to Election Day specifically refers to Saturday, November 3, 2012; Sunday, November 4, 2012; and Monday, November 5, 2012. "Military and overseas voters” are those voters identified in the federal Uniformed and Overseas Citizens Absentee Voting Act of 1986, 42 U.S.C. § 1973ff (“UOCAVA”), as amended by the Military and Overseas Voter Empowerment Act, Pub. L. 111-84, 123 Stat. 2190 (2009) ("MOVE Act”), and corresponding sections of the Ohio Election Code, Ohio Rev.Code § 3511.01. "Nonmilitary voters” are all other eligible voters.

. The Anderson Court stated that it based its "conclusions directly on the First and Fourteenth Amendments” and did not “engage in a separate Equal Protection Clause analysis.” Anderson, 460 U.S. at 786 n. 7, 103 S.Ct. 1564. The Court did not need to conduct a separate equal protection analysis because it had already incorporated that analysis into its new "flexible standard.” The Court continued, "We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment.” Id. (citing Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); Ill. Elections Bd. v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979)).

. Plaintiffs' complaint alleges that the State’s disparate treatment of non-military voters burdens their fundamental right to vote, and that this burden violates equal protection. (See R. 1, Pis.' Compl., at ¶¶ 6, 12.) The State would presumably agree that if Plaintiffs had challenged the restriction based solely on the First Amendment, the Anderson-Burdick standard would apply. The State cannot escape that standard by asserting that not only does the restriction burden Plaintiffs’ right to vote, but it also does so disparately.

. Intervenors cite to several cases purportedly applying a rational basis standard to similar election regulations, but these cases were either decided before Anderson and Burdick, see, e.g., Prigmore v. Renfro, 356 F.Supp. 427 (N.D.Ala.1972), or dealt with generally applicable, nondiscriminatory election regulations, see Gustafson v. Ill. State Bd. of Elections, No. 06-C-1159, 2007 WL 2892667 (N.D.Ill. Sept. 30, 2007).

. The Equal Protection Clause permits states to enact neutrally applicable laws, even if the impact of those laws falls disproportionately on a subset of the population. See, e.g., Crawford, 553 U.S. at 207, 128 S.Ct. 1610 (Scalia, J., concurring) (citing Washington v. Davis, 426 U.S. 229, 248, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). However, Ohio’s statutory scheme is self-evidently not neutrally applicable; it restricts the rights of some voters and not others.