RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0255p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

NORTHEAST OHIO COALITION FOR THE HOMELESS;
COLUMBUS COALITION FOR THE HOMELESS; OHIO
DEMOCRATIC PARTY,

      *Plaintiffs-Appellees/Cross-Appellants*,

    *v.*

JON HUSTED, in his official capacity as Secretary of
the State of Ohio,

      *Defendant-Appellant/Cross-Appellee*,

STATE OF OHIO,

      *Intervenor-Appellant/Cross-Appellee*.

Nos. 16-3603/3691

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:06-cv-00896—Algenon L. Marbley, District Judge.

Decided and Filed:  October 6, 2016[*]

Before:  KEITH, BOGGS, and ROGERS, Circuit Judges.

COLE, C.J. (pp. 3–9), delivered a dissent to the denial of rehearing en banc in which MOORE, CLAY, WHITE, STRANCH, and DONALD, JJ., joined.  DONALD, J. (pp. 10–13), delivered a dissent to the denial of rehearing en banc in which COLE, C.J., MOORE, CLAY, and STRANCH, JJ., joined.

_____

## ORDER
_____

The court received a petition for rehearing en banc.  The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered

_____

[*]This order was originally issued as an unpublished order on October 6, 2016.  On October 13, 2016 the court designated the order—with the separate writings contemporaneously attached—as one recommended for full-text publication.

1

upon the original submission and decision on the cases.  The petition then was circulated to the full court.[**]  Less than a majority of the judges voted in favor of rehearing en banc.

Therefore, the petition is denied.  Judge Keith would grant rehearing for the reasons stated in his dissent.  Separate writings will follow, and the mandate will issue no later than October 13, 2016.

---

[**]Judge Batchelder denies the motion for her recusal.

_____

## DISSENT

_____

COLE, Chief Judge, dissenting from denial of rehearing en banc.

### Overview

I dissent from the denial of rehearing en banc for four reasons. First, the majority ignores many of the district court's well-supported factual findings. Not only does such review disregard the clear-error standard, it undermines the court's distinct role in weighing evidence and making credibility determinations. Second, the majority's analysis under the Voting Rights Act conflicts with the text of Section 2, and hence contradicts prior decisions by our circuit and other circuits that have considered comparable voting restrictions. Third, the majority misapprehends fundamental tenets of the Voting Rights Act in a manner that would deprive the most vulnerable citizens of the right to vote. As such, the majority overlooks the Act's objective. Fourth, the majority's review under the Equal Protection Clause creates an unsupportable model for discerning whether the state has impinged on a fundamental right.

### I. Disregard of Clear-Error Standard and Undermining of the District Court's Role

As Judge Keith articulates in his compelling and persuasive dissent, our precedent required that the district court's factual findings be reviewed for clear error. "Under the clear-error standard, we abide by the court's findings of fact unless the record leaves us with the definite and firm conviction that a mistake has been committed." *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013) (internal quotation marks omitted). In other words, "[i]f the district court's account of the evidence is plausible in light of the entire record, this court may not reverse . . . even if convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently." *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012) (internal quotation marks omitted).

This case involves a particularly exhaustive record following a twelve-day bench trial. The district court heard the testimony and observed the demeanor of numerous lay and expert

witnesses, including the Assistant Secretary of State, over twenty board of election officials, a tenured sociology professor, and the Executive Director of plaintiff Northeast Ohio Coalition for the Homeless ("NEOCH"). After carefully considering voluminous evidence, Judge Algenon Marbley set forth his factual findings and legal conclusions in a detailed fifty-five-page opinion, taking care to explain the competency and credibility of the witnesses on which he relied. *See e.g.*, *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *22 (S.D. Ohio June 7, 2016) ("Dist. Op.").

Despite the high threshold for discounting the district court's judgment, the district court's clear reference to the evidence supporting its factual findings, and the majority's acknowledgment that clear error is the controlling standard, the majority repeatedly turns a blind eye to well-supported factual findings in this case. *Ne. Ohio Coal. for the Homeless v. Husted*, Nos. 16-3603/3691, 2016 WL 4761326, at *7 (6th Cir. Sept. 13, 2016) ("Maj. Op."). For example, the majority determines that SB 205's perfection requirement does not violate the Voting Rights Act based on the lack of evidence that minority voters are: 1) more likely than white voters to cast absentee ballots and 2) less likely to correctly complete their ID envelopes. *Id.* at *8. Yet the district court found that African-American voters have been more likely to have their absentee ballots rejected, Dist. Op. at *48, and that NEOCH members, the majority of whom are African-American, have had difficulty completing their envelopes. *See id.* at *7, *17-18. Moreover, the court's undergirding for the factual findings is itself unrefuted and supported by the evidence. *Id.* (noting that eight to ten percent of those living in shelters across Cuyahoga County are illiterate and the majority read at a fourth-grade level, about a third are mentally ill, and many are too embarrassed to ask for help with their forms).

Similarly, the majority denies that SB 216's perfection requirement violates the Equal Protection Clause. Maj. Op. at *12. It concludes that the state's interests in registering and identifying provisional voters outweigh the burdens of completing the additional fields. *Id.* In doing so, it relies on the notion that entering just the name and last four digits of the Social Security number of a provisional voter can result in multiple hits. *Id.* The district court's factual finding that board officials could easily identify voters before SB 216 took effect, based on the testimony of no less than three of these officials, flatly contradicts this. Dist. Op. at *37.

Finally, the majority determines that the limits on poll-worker assistance do not violate the Equal Protection Clause. Maj. Op. at \*14-15. The court considers an interest in minimizing mistakes by those workers, as well as the state's assurance that blind, disabled, and illiterate individuals may ask for help. *Id.* Neither consideration survives the district court's factual findings, however, which are as firmly rooted in the record as they are in common-sense: 1) a trained poll worker is more likely to help an untrained voter provide or complete information than introduce an error, Dist. Op. at \*39 (citing testimony by a member of the Ohio Association of Election Officials); 2) since the laws took effect, homeless voters suffering from a host of physical and mental health problems have been more likely to incorrectly fill out forms due to the lack of help, *id.* at \*18; and 3) many NEOCH members are too embarrassed to ask for help given their severe problems. *Id.* at \*7, \*18.

The majority's treatment of the factual findings in this case is concerning, not only for its abdication of clear-error review, but for the diminished role it leaves the district court. "The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985). "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575. As shown above, when a court of appeals gives short shrift to the well-supported factual findings of the district court in favor of de novo review, it risks distorting the legal analyses that depend on it. This is especially true in factually rich contexts, including cases invoking the Voting Rights Act or Equal Protection Clause.

## II.  Conflict with Text of Section 2 and Contradiction of Prior Decisions

The majority concludes that neither of the perfection requirements violates the Voting Rights Act because the "vast majority" of absentee and provisional ballots are rejected for unrelated reasons. Maj. Op. at \*8. As Judge Keith aptly notes in his dissent, however, this approach misinterprets the very concept of disparate impact. The question under Section 2 of the Voting Rights Act is whether African-American voters "have *less* opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added). The inquiry is inherently comparative.

Yet the majority concentrates on the overall impact of the laws, taking evidence of a slight total effect on whether ballots are rejected as proof that the laws would not cause African-American voters' ballots to be rejected at higher rates than white voters' ballots. *See Ohio Democratic Party v. Husted*, No. 16-3561, 2016 WL 4437605, at \*14 (6th Cir. Aug. 23, 2016) (focusing on the "disparate impact on African Americans' opportunity to participate in the political process"). But even a minor overall impact can disproportionately affect one, in this case protected, group. *See e.g.*, Dist. Op. at \*48.

Further, Section 2 of the Voting Rights Act requires courts to assess whether political processes are equally open to minorities based on the "totality of circumstances." 52 U.S.C. § 10301(b). The totality of circumstances necessarily includes the cumulative burden of the disputed laws and the various, localized factors augmenting or undercutting that burden. Thus the majority errs in considering the effect of each law in isolation, both from the other challenged laws and other legal and non-legal voting restrictions. As Judge Keith highlights in his dissent, the Fourth Circuit has already faulted a lower court for "inspecting the different parts" of a voting restriction "as if they existed in a vacuum." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 242 (4th Cir. 2014). The lower court should, rather, have "consider[ed] the sum of those parts . . . on minority access to the ballot box." *Id.* Notably, the Fourth Circuit found the lower court's piecemeal method difficult to "square with Section 2's mandate to look at the totality of the circumstances." *Id.* (internal quotation marks omitted).

### III.  Threat to Most Vulnerable Citizens Despite Objective of Voting Rights Act

The majority determines that the reduced cure period survives scrutiny under the Voting Rights Act due to a lack of evidence as to how many absentee or provisional voters used the eliminated days in past elections. Majority Op. at \*9. Likewise, it concludes that the limits on poll-worker assistance are permissible under the Act based on the little proof that minority voters are more likely than white voters to cast absentee ballots, and no evidence at all that they disproportionately benefitted from the assistance in past elections. *Id.*

But Section 2 does not require plaintiffs to demonstrate hardship with mathematical precision. Indeed, the majority cites no authority supporting its conclusion and other circuits

have taken an entirely different approach. In *Veasey v. Abbott*, for instance, the Fifth Circuit rejected the state's argument that the district court erred in finding that an ID requirement violated the Voting Rights Act. 830 F.3d 216 (5th Cir. 2016). The state cited the absence of "any concrete proof that voters were denied the right to vote" as a result of the requirement. *Id.* at 253. The circuit credited the district court's acceptance of expert testimony underscoring the disparate impact of the requirement on the poor, who in turn were shown to be minorities at disproportionate rates. *Id.* at 250, 254. The circuit took special heed of record evidence explaining the connection between poverty and the inability to meet the requirement. *See e.g., id.* at 251 ("unreliable and irregular wage work and other income . . . affect the cost of taking the time to locate and bring the requisite papers and identity cards, travel to a processing site, wait through the assessment, and get photo identifications") (internal quotation marks omitted).

Here, the district court made comparable findings about the challenged laws' disparate impact on African-Americans. These include the inference that homeless voters, again disproportionately minorities, have been more likely to make mistakes on voting forms since the limits on poll-worker assistance took effect. Dist. Op. at *18. They also encompass findings on the reasons for this phenomenon: everything from illiteracy to the humiliation it engenders, which prevents those who are exempt from the limits from seeking help. *Id.* By the same token, the district court's findings that African-Americans rely on public transportation at higher rates than whites, and tend to lack neighbors with cars, support the conclusion that decreasing the days available to cure mistakes would have a disparate impact on them under the Voting Rights Act. *Id.* at *18, *26, *31.

To require plaintiffs to provide precise proof in cases brought under the Voting Rights Act is to ignore the reality that such proof is virtually impossible to come by. This is true because of the peculiar nature of many voting restrictions, and the characteristics common to those who allege violations of the Act in the first place. *See id.* at *13 (cataloguing other, proposed voting restrictions, including a bill "requiring state universities to provide in-state tuition rates to students if they provided those students with ID that they needed to vote"). Indisputably, plaintiffs in Voting Rights Act cases tend to represent the most vulnerable members of society.

The present case is illustrative. NEOCH and Columbus Coalition for the Homeless plaintiffs embody the interests of poorly educated voters, many of whom are mentally ill, and who would rather conceal their dependence on others than document it. *Id.* at *7, *18. They are also a transient population and thus difficult to keep track of and follow. *Id.* at *6-7. The Voting Rights Act's focus on historically disadvantaged groups anticipates this and requires that courts avoid erecting too high of a barrier to the claims advanced under it. 52 U.S.C. § 10301(a) (referring to "race" and "color"). Otherwise, we risk betraying the Act's purpose—to ensure that the most marginalized are able to participate in the electoral process despite continuing inequities.

## IV. Danger to Other Fundamental Rights

The majority concludes that limits on poll-worker assistance do not unduly burden the right to vote under the Equal Protection Clause because the state's "legitimate interest in minimizing" mistakes by poll-workers justifies those limits.[1] Majority Op. at *15. But this takes the strength of the state's rationale for the limits at face value. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 195-96 (2008) (taking time to assess the "legitimacy" of even the most accepted interest in voting restrictions by noting "flagrant examples of [voter] fraud in other parts of the country" and the state's own experience with fraud in a recent election). The majority's error means accepting "minimizing mistakes by poll-workers" as a legitimate basis for the limits on their assistance where the historic *function* of such workers has been to ensure that the electoral process works. *See e.g.*, Dist. Op. at *39 ("[P]oll workers are trained and certainly more skilled in filling out forms than homeless voters."). Indeed, the district court's factual findings confirm that poll-worker assistance leads to more complete and accurate information from voters. *Id.* To this extent, the limits seem to be a solution in search of a problem.

---

[1]I do not address in detail the majority's conclusions about the challenged laws' burdens because I subscribe to Judge Donald's analysis of *Crawford v. Marion Cty. Election Bd*., 553 U.S. 181 (2008). I too "disagree with the majority's approach of consider[ing] the burden that the provisions place on all Ohio voters" (internal quotation marks omitted). What the Equal Protection Clause requires, rather, is to identify the population that the laws actually affect, and then gauge the nature and severity of the laws' impact on that group. *Crawford*, 553 U.S. at 200 (examining whether it is possible to assess the magnitude of the burden on a narrow class of voters).

Assuming arguendo that the state has a legitimate interest in minimizing mistakes by poll-workers, the majority neglects to inquire into the extent to which the limits on assistance actually advance that interest. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) ("even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained"). This is especially confounding where the limits subvert the state's asserted rationale, with diminished involvement by poll-workers leading to greater, not fewer errors. Dist. Op. at *39.

The majority also disagrees that the reduced cure period violates the Equal Protection Clause. Majority Op. at *15. In the face of evidence that the ten-day period had inconvenienced no board officials, the court states that a government need not wait until an issue arises to enact a law addressing it. *Id.* It is true that states may act to ward off a problem. But they may not impinge on a constitutional right without offering evidence, both of the likelihood and expected consequences of the problem, and probability that the law will in fact alleviate it. Given the relative nature of the undue burden standard, the sufficiency of the state's proof will depend on the severity of the burden established by plaintiffs.

The majority's choice not to require anything of the state beyond a conclusory statement of a law's benefits where the right to vote is at stake belies the Supreme Court's treatment of threats to this and other fundamental liberties. *See e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("It is beyond cavil that voting is of the most fundamental significance under our constitutional structure.") (internal quotation marks omitted); *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) ("distinctions in laws denying fundamental rights" "call[] for the closest scrutiny"). This approach creates a perilous model for assessing potential violations of constitutional rights other than the right to vote.

**Conclusion**

Because the full court's review is needed to maintain uniformity of this circuit's decisions, and the majority's opinion raises several issues of exceptional importance, I respectfully dissent from the denial of rehearing en banc.

————————————

**DISSENT**

————————————

DONALD, Circuit Judge, dissenting from the denial of *en banc* rehearing.

The majority must not pretend to write on a clean slate while ignoring the bloody and shameful history of denial. On December 6, 2015, this country commemorated the 150th anniversary of the ratification of the Thirteenth Amendment on December 6, 1865, which abolished years of enslavement of people of African descent. Although monumental, that constitutional amendment still did not afford citizens of African descent the right to vote. On July 9, 1868, the Fourteenth Amendment was adopted and purported to provide equal protection and citizenship rights for African Americans. Finally, on March 30, 1870, the Fifteenth Amendment was ratified granting African American men the right to vote. Yet, 100 years thereafter, United States citizens of African descent languished as second-class citizens. They were denied the right to vote by tactics and methodologies that all would decry such practices in a developing country. It was only by blood, sweat, advocacy, and even death, that African Americans were finally afforded what the Constitution provided more than 100 years earlier. It was not until 1965 with the passage of the Voting Rights Act that this most important badge of citizenship could be practiced by African Americans. In speaking before Congress on the issue of voting rights following the violence met by protestors during their peaceful march in Selma, Alabama, former President Lyndon B. Johnson rightly declared that "it is all of us, who must overcome the crippling legacy of bigotry and injustice. And we shall overcome." The Voting Rights Act "was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Bd. of Elections*, 393 U.S. 544, 565 (1969). Yet, the majority's decision in this case ignores history and takes us in the wrong direction.

Though well over a century has passed since the enactment of the Fifteenth Amendment, which purported to prohibit the government from denying a citizen the right to vote on the basis of race, to this day, many citizens are still effectively being denied the right to vote. *See generally Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2632–52 (2013) (Ginsburg, J., dissenting)

(detailing the variety and persistence of "second generation barriers" created in recent years to deny minorities the right to fully participate in the electoral process). While in the past, efforts to prevent these groups from voting were more overt, in the present day, we see calculated and systematic attempts to prevent disadvantaged and marginalized groups, like ethnic minorities, the elderly, and the poor, from voting. Gone are the days of literacy tests, poll taxes, and the attacking and jailing of minorities who dared to challenge the pervasive discrimination they faced in attempting to exercise their right to vote. But the vestiges of the old methods used to deny minorities the right to vote remain. These antiquated measures have merely been replaced with more subtle, creative ways to deny these citizens the right to vote, including enacting voting identification laws; establishing large voting districts to dilute minorities' voting power; enacting laws to reduce early voting days; and, as we have just seen in the case of Ohio, creating needless requirements, the imperfection of which results in one's vote being rejected. This case adds to the persistent practice of surreptitiously denying certain citizens their right to vote.

I disagree with the majority's conclusion, and the decision to deny *en banc* rehearing, for two reasons. First, the Equal Protection claim. I disagree with the majority's approach of "consider[ing] the burden that the provisions place on all Ohio voters." Like Judge Keith observes in his dissent, the conclusion that "we must inquire whether a voting regulation burdens *everyone*, and only when it does, will that regulation be deemed *unequal*," defies both logic and common sense. Rather than following Justice Scalia's approach in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), the majority should have followed Justice Stevens' method in that opinion. Although no majority was reached in *Crawford*, Justice Stevens' reasoning decided the case on a narrower ground than Justice Scalia's because while both opinions upheld the challenged law, Justice Scalia's opinion broadly held that the restriction must burden all voters, so went a step further than Justice Stevens' opinion. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *see also Obama for Am. v. Husted*, 697 F.3d 423, 441 n.7 (6th Cir. 2012) (White, J., concurring/dissenting). Though, in Justice Stevens' opinion in *Crawford*, the small number of voters who may experience a special burden from the new voting laws could not establish that the laws imposed "excessively burdensome requirements" on a class of voters, 553 U.S. at 202, it did not hold that a limited class of voters could not establish an undue burden unless the burden was placed on *all* voters. Rather, the plaintiffs in *Crawford* could not make the

requisite showing because "on the basis of the evidence in the record it [was] not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified." *Id.* at 200.

Contrary to *Crawford*, here, the record did make it possible to quantify the burden placed on this narrow class of voters. Specifically, the district court found that the new laws imposed a significant burden on Appellees because many of their members are homeless and illiterate, so have difficulties correctly filling out forms. *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *17–18, *37 (S.D. Ohio June 7, 2016). The majority concludes that the state's interest in confirming eligible voters justifies the addition of the address and birthdate requirements, but this conclusion ignores the district court's findings that election officials could typically identify voters with provisional ballots using only one or two fields. *See id.* at *38. So adding two fields—birthdate and address—to the already existing three fields does not seem to further the identified interest. Moreover, combatting voter fraud was not a justification for either SB 205 or SB 216. *Id.* at *37. Therefore, I cannot agree with the majority's conclusion that the state's interest outweighs the increased burden placed on these voters when Ohio rejects ballots based on two additional unnecessary requirements.

The majority also erred with respect to the Voting Rights Act claim. The district court found that SB 205 and SB 216 had a disparate impact on African American voters because minority voters had higher rates of provisional and absentee ballot *rejection*, even "account[ing] for a variety of key factors besides race that were likely to explain disparities in rejection rates (including the median age, income, and educational attainment of the white voters in those counties as well as the urbanicity of the counties)." *Id.* at *47–*49. The majority, however, rejected these findings, reasoning that there was "scant evidence" that minority voters used absentee ballots more than white voters.

Appellate courts must view the district court's factual findings under the clearly erroneous standard, meaning that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). Though the

majority was entitled to reject the district court's account of the facts if it was "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it," *see id.* at 575, the majority did not make that showing here. That minority voters do not *use* absentee ballots any more than white voters does not undermine the conclusion that minority voters' absentee and provisional ballots are *rejected* at a higher rate than those of white voters. The proper focus should have been on the disparate impact of the new provisions, not the rate at which minorities use absentee ballots. *See Ohio Democratic Party v. Husted*, No. 16-3561, 2016 WL 4437605, at *13 (6th Cir. Aug. 23, 2016) (published) (noting that, to succeed on a Voting Rights Act vote-denial claim, plaintiffs must establish that the challenged law caused a disparate impact amounting to denial of a protected class members' right to vote).

More than "[a] century after the Fourteenth and Fifteenth Amendments guaranteed citizens the right to vote free of discrimination on the basis of race, the blight of racial discrimination in voting continue[s] to infect the electoral process in parts of our country." *Shelby Cty.*, 133 S. Ct. at 2633 (Ginsburg, J., dissenting) (citation omitted) (internal quotation marks omitted). By inexplicably considering only whether these new voting laws placed a burden on *all* Ohio voters, and utterly disregarding the district court's factual findings that minority voters' ballots were rejected more often than those of white voters, the majority opinion carries on this practice of denying disadvantaged groups the right to vote and halts the progress made for decades to preserve this core right. I dissent from the denial of *en banc* rehearing in this case because, like Judge Keith, "I will not forget. I cannot forget—indeed America cannot forget—the pain, suffering, and sorrow of those who died for equal protection and for this precious right to vote."

ENTERED BY ORDER OF THE COURT

_____

Deborah S. Hunt, Clerk