RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0421P (6th Cir.)
File Name: 00a0421p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

STEPHEN PLEDGER (99-4254);
MARCIA G. PLEDGER
(99-4276),
     *Plaintiffs-Appellants,*

     *v.*

UNITED STATES OF AMERICA,
     *Defendant-Appellee.*

Nos. 99-4254/4276

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 97-00291—Jack Sherman, Jr., Magistrate Judge.

Argued: September 13, 2000

Decided and Filed: December 29, 2000

Before: GUY and MOORE, Circuit Judges; DOWD,
District Judge.[*]

_____

[*] The Honorable David D. Dowd, United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:**  James H. Stethem, ROSENBERG, HERFEL, STETHEM & BENDER, Cincinnati, Ohio, for Appellants. Marion E.M. Erickson, U.S. DEPARTMENT OF JUSTICE, APPELLATE SECTION, Washington, D.C., for Appellee. **ON BRIEF:**  James H. Stethem, ROSENBERG, HERFEL, STETHEM & BENDER, Cincinnati, Ohio, James V. Magee, Jr., Cincinnati, Ohio, for Appellants.  Marion E.M. Erickson, Bruce R. Ellisen, U.S. DEPARTMENT OF JUSTICE, APPELLATE SECTION, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  This case involves the question of whether individual taxpayers were "at risk," as defined in 26 U.S.C. § 465(b), with regard to a three-party sale-leaseback transaction between a parent company and two of its subsidiaries and could therefore deduct losses from an investment in a trust formed by one of the subsidiaries.  In the tax years ending in 1985, 1986, 1987, and 1988, Plaintiffs-Appellants, Stephen ("Pledger") and Marcia Pledger ("Mrs. Pledger") (collectively referred to as "the Pledgers"), claimed losses deriving from Pledger's investment in a trust under § 465.  The Internal Revenue Service ("IRS"), however, disallowed the Pledgers' loss deductions and instead assessed an amount totaling approximately $135,226 in taxes, penalties, and interest against the Pledgers.  The Pledgers paid the assessed amount and then filed claims for refunds and amended individual income tax returns for each of the aforementioned tax years, but the IRS denied their claims.

The Pledgers then filed this lawsuit against the IRS in the United States District Court for the Southern District of Ohio, which was transferred to a United States Magistrate Judge.

of fact. Therefore, we hold that there was no inconsistency in the decisions rendered by the magistrate judge on the IRS's motions for summary judgment and the magistrate judge's opinion following the bench trial on the merits.

### III.   CONCLUSION

For the reasons stated above, we AFFIRM the magistrate judge's decision.

After holding a bench trial pursuant to the parties' consent, the magistrate judge issued an opinion which held that the Pledgers were not at risk under § 465 and entered judgment in favor of the IRS.

The Pledgers now appeal the magistrate judge's decision, claiming that the magistrate judge erred in determining that they were not at risk under § 465 and that the magistrate judge's decision from the bench trial was inconsistent with his previous rulings on the IRS's motions for summary judgment. For the reasons that follow, we **AFFIRM**.

### I.   BACKGROUND[1]

In August of 1982, American Broadcasting Companies, Inc. ("ABC") acquired two satellite transponders from RCA American Communications, Inc. Transponders are electronic devices that receive, select, amplify, and re-transmit voice, data, and video signals. In May of 1983, ABC assigned all of its rights, benefits, responsibilities, and liabilities with respect to the two transponders to its wholly owned subsidiary, ABC Video Enterprises, Inc. ("ABC Video").

On October 30 and 31, 1984, Integrated Equipment Leasing Corporation ("IELC"), a wholly owned subsidiary of Integrated Resources, Inc. ("Integrated"), acquired the two transponders from ABC Video for a purchase price of $9,774,701 each. Then, on October 31, 1984, the very same day that IELC had completed its purchase of the transponders, IELC entered into two identical lease agreements with ABC Video.

On December 31, 1984, IELC sold the two transponders to Investors Credit Corporation ("ICC"), another wholly owned subsidiary of Integrated. ICC paid the purchase price for the transponders with a cash down-payment and a promissory

---

[1] With the exception of the facts detailing the activities that occurred after the Pledgers filed this lawsuit, the background facts are derived from the Joint Stipulation of Facts filed with the magistrate judge.

note payable to IELC. Also, on December 31, 1984, ICC agreed to lease the transponders back to IELC.[2] This agreement required IELC to pay ICC fixed rent that approximately equaled, in both time and amount, the payments that ICC owed to IELC. As an incentive for ICC to enter into this master lease agreement with IELC, Integrated agreed to guarantee unconditionally IELC's rental payments under the master lease agreement.

On the very same day in which it had both bought and leased the two transponders, ICC formed Satellite Equipment Trust A ("the Trust") as a grantor trust, transferred the transponders to the Trust, and assigned all of its rights and liabilities with respect to the transponders to the Trust. Prior to the formation of the Trust, a confidential memorandum offering forty units of beneficial interest in the Trust for sale to private investors was released. According to the Trust documents, New York law governed the interpretation of the agreement.

Following the release of the confidential memorandum, Pledger acquired one unit of beneficial interest in the Trust by paying $18,646 in cash to ICC and issuing promissory notes in the amounts of $86,936 and $390,988 to another wholly owned subsidiary of Integrated and to ICC, respectively. The payments that Pledger was obligated to make to ICC equaled his share of the payments that IELC was obligated to pay the Trust under the master lease agreement with ICC. The fixed rental payments that the Trust received from IELC were applied to satisfy the payments Pledger was required to pay ICC.

When the Pledgers filed their joint tax returns for the taxable years ending in 1985, 1986, 1987, and 1988, they claimed loss deductions with respect to Pledger's investment in the Trust for that part of the investment attributable to his promissory note to ICC. The IRS, however, determined that

---

[2]For purposes of clarity, this ICC/IELC lease is referred to as "the master lease agreement."

### C.  Standard For Trial Versus Summary Judgment

The Pledgers also argue that the bench trial decision in this case is inconsistent with the magistrate judge's previous decisions on the IRS's motions for summary judgment. We disagree. The standard that the magistrate judge was required to apply in rendering a decision on the IRS's motions for summary judgment substantially differed from the standard for deciding the issues in the case after trial.

When considering the IRS's motions for summary judgment, the magistrate judge was required to view all facts and inferences drawn in the light most favorable to the Pledgers, the non-movants in this case, and then to determine as a matter of law whether a reasonable jury could find for the Pledgers based upon all the evidence presented. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, the magistrate judge could not grant summary judgment to the IRS if he found that there was a genuine issue of material fact. FED. R. CIV. P. 56(c). In considering both of the IRS's motions for summary judgment, the magistrate judge determined that there were genuine issues of material fact regarding the extent of Integrated's participation and control over ICC; therefore, he could not grant summary judgment to the IRS on either motion. *See Sterling*, 154 F.R.D. at 588 ("A determination of domination and control by the parent over the daily operations of a subsidiary is usually a matter for the trier of fact.").

During the bench trial, however, the magistrate judge was also the finder of fact. Therefore, he could weigh and balance the credibility and reliability of the evidence placed before him and make the factual findings necessary to decide whether ICC was a mere instrumentality of Integrated. Once the magistrate judge reached a decision on the relevant factual findings regarding ICC's control over its day-to-day operations and Integrated's involvement in ICC's operations and the creation of the Trust, the magistrate judge was free to render a decision on the issue of whether the Pledgers were at risk under § 465, even if the parties disputed material issues

ICC's office; (6) the amount of business discretion displayed by the dominated company as shown by Integrated's involvement in ICC's billing and accounting work and the creation of the Trust; (7) the corporations' failure to deal with each other at arm's length as shown by ICC's use of Integrated's forms in creating the Trust and Integrated's counsel and employees in reviewing the necessary documents; (8) the corporations' failure to treat the allegedly dominated corporation as an independent profit center as shown by the fact that all payments of interest and debts were directed to Integrated and that none of the payment documents, including checks from Pledger, listed ICC on them; (9) the payment of debts and guarantees by the parent for the benefit of the subsidiary as shown through the December 31, 1984 Guaranty Agreement entered into between Integrated and ICC; and (10) the subsidiary's use of the parent's property as if it were its own, as shown by ICC's use of Integrated's office space and document forms. In sum, the relevant factors under New York law all weigh in favor of the magistrate judge's ruling that ICC was a mere instrumentality of Integrated.

Because ICC was a mere instrumentality of Integrated, Integrated effectively became both the guarantor and payee of the three-party sale-leaseback transaction at issue. Therefore, this case is unlike *Emershaw*, where the guarantor was a third party that was not otherwise connected to the transaction and had the potential to expose the Emershaws to personal liability without recourse by refusing to honor its guaranty. Here, if Integrated were to refuse to honor its guaranty of IELC's obligations to the Trust or to go bankrupt, Pledger would have a solid defense against any action brought by ICC to recover payments that the investors in the Trust owed to ICC because any liability to ICC, or in essence Integrated, would be canceled out by Integrated's promise to cover IELC's payments to the Trust. In essence, the three-party sale-leaseback transaction in this case effectively insulated Pledger from any responsibility he had to cover his obligations to ICC. Thus, we affirm the magistrate judge's decision that the Pledgers were not "at risk" within the meaning of § 465.

the Pledgers were not at risk under § 465 with respect to the note to ICC and assessed additional taxes, penalties, and interest against the Pledgers. The Pledgers then fully paid these amounts and filed claims for refunds, but their claims were denied.

The Pledgers then filed this lawsuit in the United States District Court for the Southern District of Ohio. On June 1, 1998, the IRS filed a motion for summary judgment, asserting that the Pledgers were not at risk under § 465 because ICC, to which Pledger was required to make payments, was merely an instrumentality of Integrated and therefore Integrated was both the payee and guarantor in the three-party sale-leaseback arrangement. The magistrate judge denied the IRS's motion for summary judgment on the ground that there were genuine issues of material fact regarding the relationship between Integrated and ICC.

The IRS then deposed Benjamin Jung, who formerly was the General Counsel of Integrated's equipment leasing division and a Senior Vice President of Integrated. In his deposition, Jung testified that Bill Adair, who formerly was the head of Integrated's equipment leasing group, decided to create the Trust to provide financing to investors. Jung also testified that Integrated's marketing staff developed the underlying equipment leasing transaction for the Trust; that Integrated's equipment leasing group originated the transaction involving the Trust; and that Integrated's equity marketing group analyzed the proposed transaction to determine how it could be structured into one of the company's products. Additionally, Jung testified that Integrated's equipment leasing group and equity sales group were involved in negotiating the terms of the investors' promissory notes to ICC and that the promissory notes issued by the investors to ICC were based upon standard form notes created by employees of Integrated. Jung further testified that he was involved in the process of drafting the confidential memorandum that offered forty units of beneficial interest in the Trust to private investors and that he, "[a]s counsel . . . would review and supervise the drafting of that memorandum

which was drafted by outside counsel, and . . . [had] input on a lot of factual matters and just reviewing the development of the document." Joint Appendix ("J.A.") at 456 (Jung Dep. at 20).

With regard to the operation of ICC, Jung testified that ICC's day-to-day operations consisted of billing, collecting, and accounting for transactions between investors and ICC but that Integrated's accounting department handled the recording and reporting functions for ICC. Jung further explained that ICC's offices were located at the offices of Integrated, and while he testified that ICC's officers and directors controlled the day-to-day operations of ICC, he did not identify the daily tasks they performed for ICC. Jung also stated that, with one exception, all of the officers and directors of ICC were also officers of Integrated. Jung further stated that he was "fairly certain" that all monies that were remitted from investors to ICC went to Integrated. J.A. at 455 (Jung Dep. at 19). With all this said, though, in response to a question by the Pledgers' counsel regarding whether Jung believed that "ICC was a separate entity *in the legal sense*," Jung asserted "I do." J.A. at 470 (Jung Dep. at 34) (emphasis added).

Using the testimony from Jung's deposition as its support, the IRS then filed a renewed motion for summary judgment. Again, the magistrate judge denied this motion due to the existence of genuine issues of material fact. After holding a bench trial on the merits of the case, the magistrate judge issued an opinion, finding that the Pledgers were not at risk under § 465 because ICC was a mere instrumentality of Integrated.

## II. ANALYSIS

On appeal, the Pledgers argue that the magistrate judge erred in finding that ICC was a mere instrumentality of Integrated and therefore erred in holding that they were not at risk as defined in § 465(b). We hold that the magistrate judge did not err in determining that the Pledgers were not "at risk" under § 465 because ICC was a mere instrumentality of

were employees of Integrated. J.A. at 454-55 (Jung Dep. at 18-19). Likewise, the magistrate judge's conclusions that Integrated was involved in setting up the Trust, that Integrated and ICC did not deal with each other at arm's length, that ICC was formed to provide financing to investors, and that ICC did not have any discretion in its activities and did not act independently from Integrated are supported by Jung's testimony that ICC was formed by Integrated to help finance investments in the Trust, that the investors' promissory notes to ICC were standard form notes developed in part by Integrated employees, that Jung participated in and supervised the drafting of the Confidential Memorandum for the Trust, and that Integrated's accounting department handled ICC's recording and reporting functions. J.A. at 444-56, 462-64 (Jung Dep. at 8-20, 26-27). Finally, the magistrate judge's finding that Integrated's guaranty under the master lease agreement inured to the benefit of the Pledgers is supported by a December 31, 1984 Guaranty Agreement entered into between Integrated and ICC. J.A. at 918-21 ("Guaranty" at 1-4).

In light of the magistrate judge's factual findings, which are not clearly erroneous, we conclude that the magistrate judge did not err in concluding that ICC was an instrumentality of Integrated. Of the ten factors listed in the applicable test under New York law, all of them are supported by the magistrate judge's factual findings and thereby weigh in favor of a conclusion that ICC is a mere instrumentality of Integrated. These findings are as follows: (1) the absence of corporate formalities as shown by ICC's lack of independent office space, the intermingling of finances and the overlap of officers and directors between ICC and Integrated, and ICC's limited capital or assets; (2) inadequate capitalization as shown by ICC's initial capitalization; (3) funds transferred to the parent for the parent's use as shown by the direction of payments to Integrated; (4) overlap in ownership, officers, directors, and personnel as shown by the fact that all of ICC's directors and officers were Integrated employees and that only one ICC officer was not also an officer for Integrated; (5) common office space and address as shown by the location of

day-to-day activities that were being performed by ICC. Instead, he testified that Integrated's staff managed the accounting activities. Mr. Jung attempted to identify certain marketing functions that were performed by ICC as essentially a "wholesaler" that presented packages to Integrated's equity sales group. However, Mr. Jung then explained that a wholesaler group within Integrated performed these tasks.

34. The Court finds that ICC did not act independently. Instead, its functions were reviewed by other Integrated groups and it was managed as a division of Integrated.

J.A. at 32-34 (citations omitted).

We hold that these factual findings are not clearly erroneous because there is sufficient evidence in the record to support all of them. To begin, the Confidential Memorandum for the Trust reveals that ICC's total assets as of November 30, 1984,[3] included only $100 in cash and a $2,000,000 demand promissory note from Integrated's purchase of ICC's common stock. J.A. at 614 (Satellite Equipment Trust A, Confidential Memorandum, "Balance Sheet of ICC" at 74). Additionally, the magistrate judge's conclusion that all of Pledger's payments on his ICC note were sent to Integrated's place of business and were ultimately received by Integrated is supported by photocopies of billing statements from Integrated to Pledger, which do not have ICC's name on them and which require that questions and correspondence be directed to Integrated. Such conclusion is also supported by photocopies of checks from Pledger, which were sent to the Trust "c/o" Integrated. J.A. at 908-17. Furthermore, the magistrate judge's conclusions that ICC was located at the offices of Integrated and that ICC and Integrated have an overlap in officers, directors, and personnel are supported by Jung's deposition testimony that ICC was located at Integrated's offices and that all of ICC's officers and directors

---

[3]ICC was incorporated in November 1984.

Integrated. The record supports the magistrate judge's conclusion that Integrated exercised such control and dominion over ICC that ICC was a dummy corporation for Integrated, thereby making Integrated both the guarantor and payee in the three-party sale-leaseback transaction at issue. In sum, we believe that the magistrate judge was correct in concluding that the Pledgers were not "at risk" of incurring any losses from the investment in the Trust even if it proved to be unprofitable, because any debts that they owed to ICC through the Trust would be canceled out by Integrated's guaranty of IELC's obligations to the Trust.

### A. Sixth Circuit Interpretation of "At-Risk"

Section 465(a)(1) of the Internal Revenue Code provides that a taxpayer who is engaged in certain designated activities may deduct losses occurring from these activities only to the extent that the taxpayer is "at risk" for such activities at the close of a taxable year. 26 U.S.C. § 465(a)(1). Equipment leasing, which is the type of activity involved in this case, comes within the terms of § 465. 26 U.S.C. § 465(c)(1)(C).

Under § 465(b), a taxpayer is "at risk" for amounts of money and the adjusted basis of other property contributed by the taxpayer to the designated activity. 26 U.S.C. § 465(b)(1)(A). A taxpayer is also "at risk" for amounts of money borrowed for use in the activity to the extent that he is personally liable for the repayment of such amounts or to the extent that he has pledged property, other than the property used in the activity, as security for such borrowed amounts. 26 U.S.C. §§ 465(b)(2). A taxpayer, however, is not "at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." 26 U.S.C. § 465(b)(4).

The Sixth Circuit has analyzed the "at-risk" provisions in § 465 with respect to a three-party sale-leaseback transaction in only two published opinions. *See Martuccio v. Commissioner*, 30 F.3d 743, 750-51 (6th Cir. 1994); *Emershaw v. Commissioner*, 949 F.2d 841 (6th Cir. 1991). In these cases, the Sixth Circuit rejected the reasoning of every

other circuit addressing this issue which held that the circular offsetting structure of payments in a three-party sale-leaseback transaction is sufficient to trigger the § 465(b)(4) exception from "at risk" treatment for notes that will be paid through a circle of payments. *See, e.g., Waters v. Commissioner*, 978 F.2d 1310, 1316-17 (2d Cir. 1992), *cert. denied*, 507 U.S. 1018 (1993); *Young v. Commissioner*, 926 F.2d 1083, 1089 (11th Cir. 1991); *Moser v. Commissioner*, 914 F.2d 1040, 1048 & n.21 (8th Cir. 1990); *American Principals Leasing Corp. v. United States*, 904 F.2d 477, 482-83 (9th Cir. 1990). Unlike these courts, which use an economic reality test to determine whether a transaction is structured such that it removes any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable, the Sixth Circuit applies the "payor of last resort" test and asks whether, in a worst case scenario, the individual taxpayer will suffer any personal, out-of-pocket expenses. *See Emershaw*, 949 F.2d at 848-51. This analysis regarding whether a taxpayer is "at risk" within the meaning of § 465(b) was first adopted by the Sixth Circuit in *Emershaw* (and was later followed by this court in *Martuccio*).

In *Emershaw*, CIS Leasing Corporation ("CIS") purchased computers and computer peripherals from the IBM Corporation ("IBM") for $2,935,143. To finance these purchases, CIS took out a number of nonrecourse bank loans. After leasing the equipment to end-users, CIS then sold the equipment for $3,030,300 to Program Leasing Corporation ("Program"), which paid $180,000 in cash as a down-payment and paid the balance of the purchase price with an installment note. *Emershaw*, 949 F.2d at 843. Program then sold the equipment for $3,030,300 to LEA, in which the Emershaws were partners. For its purchase, LEA paid a small cash down-payment and gave Program a partial recourse installment note equal to the installment note Program had given CIS. *Emershaw*, 949 F.2d at 843-44.

LEA then leased the equipment back to CIS for monthly rental payments equal to the monthly payments LEA owed on

sent late notices on its own billing statements and the statements provided that questions and correspondence should be directed to Integrated.

28. ICC is located at the offices of Integrated Resources.

29. ICC and Integrated have an overlap in officers, directors, and personnel. All the officers and directors of ICC were employees of Integrated. In fact, only one officer of ICC was not also an officer of Integrated. Other than officers, ICC did not have any employees.

30. Integrated was integrally involved in setting up Satellite Equipment Trust A. "The underlying equipment leasing transaction was developed, . . . through the New York marketing staff." Integrated's lease marketing group solicited vari[ous] potential clients, like ABC, looking for a transaction[] that they could structure. Once the product was identified . . . Integrated's equity marketing group was involved in structuring the Trust.

31. ICC and Integrated did not deal with each other at arms length. In outlining its conflicts of interest in the offerings memorandum, Integrated disclosed that "the terms of the agreements and other instruments referred to herein, including the Master Lease and the Beneficiary Notes, and the compensation to be paid to ICC and its Affiliates have been or will be established by Integrated and are not, and will not be, the result of arm's-length negotiations among independent parties[.]"

32. ICC was formed to provide financing to investors. The terms of the promissory notes that investors issued to ICC were negotiated between investor's counsel and members of Integrated's equipment lease group.

33. ICC did not have any discretion in its activities. Instead, Integrated dominated and/or oversaw all essential activities. Although Mr. Jung testified that ICC's officers and directors controlled the day-to-day operations of ICC, he did not identify any of the

guarantees by the parent for the benefit of the subsidiary; and (10) whether the subsidiary uses the property of the parent as if it were its own." *Sterling*, 154 F.R.D. at 588 (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)) (analyzing New York law); *see also Porter v. LSB Indus., Inc.*, 600 N.Y.S.2d 867, 874 (N.Y. App. Div. 1993). As a general matter, because a "determination of domination and control by the parent over the daily operations of a subsidiary" often requires weighing and assessing the evidence presented, such decision "is usually a matter for the trier of fact." *Sterling*, 154 F.R.D. at 588.

In this case, the magistrate judge made the following findings of fact regarding the question of whether ICC is a mere instrumentality of Integrated:

24. Integrated executed a guaranty to ICC guarantying rent payments under the master lease agreement. This guaranty inured to the benefit of Plaintiffs, per the guarantee, as Mr. Pledger was a transferee of the equipment leased. In fact, one of the investor benefits listed in the literature provided to potential investors included "guaranteed rental obligations."

*****

26. ICC's initial capitalization included only $100 in cash, from Integrated's purchase of all its common stock, and a 2,000,000 demand promissory note from Integrated.

27. Plaintiff Stephen Pledger[']s payments of interest on the ICC notes were ultimately received by Integrated, not ICC. At least four (4) of Plaintiff's installment and/or interest payments on the ICC note were made payable directly to Integrated. Other payments were made payable to Satellite Equipment Trust A, [n]ot ICC, and sent c/o Integrated. All payments were sent to Integrated's place of business. ICC is not identified anywhere on the checks or the billing statements. In addition, Integrated

its note to Program. Additionally, CIS's rental payments to LEA were guaranteed by CIS's parent, Continental Information Systems ("Continental"). All payments on the lease and various notes were made by offsetting bookkeeping entries pursuant to letter agreements between the parties so that no actual exchange of money occurred. *Emershaw*, 949 F.2d at 844.

In *Emershaw*, the Sixth Circuit affirmed the decision of the Tax Court, which found that the Emershaws were "at risk" under § 465 for their pro rata share of LEA's partial recourse note because they were the payors of last resort. The panel explained that, in the worst case scenario where CIS went bankrupt, renounced its lease, and stopped making rental payments to LEA, LEA partners, such as the Emershaws, would still be required to pay Program the balance of the partial recourse note issued to Program. As a result, the panel concluded that the Emershaws were "at risk" within the meaning of § 465. The panel further held that there did not exist a loss-limiting arrangement within the meaning of § 465(b)(4) through "a *collateral agreement* protecting a taxpayer from loss *after the losses have occurred*, either by excusing him from his obligation to make good on losses or by compensating him for losses he has sustained." *Emershaw*, 949 F.2d at 849.

In reviewing the Pledgers' claim in this case, we believe, and the parties agree, that if ICC were a mere instrumentality of Integrated, as is argued by the IRS, then this case is distinguishable from *Emershaw* in one important respect. In *Emershaw*, if CIS, who owed payments to LEA (and thus the Emershaws), became insolvent and the guarantor Continental also went bankrupt or refused to honor its guaranty, LEA would still have to make its payments to Program under the installment note, thereby making the Emershaws, partners of LEA, personally liable to Program for the payments LEA owed to Program.

In the Pledgers' case, however, if ICC were a mere instrumentality of its parent, Integrated, then Integrated,

which guaranteed the payments that IELC was required to make to the Trust (of which Pledger was an investor), would also be the payee of Pledger's note, under which Pledger was required to make payments to ICC, which had an obligation to IELC. In other words, if IELC failed to meet its rental obligations to the Trust and Integrated went bankrupt or failed to honor its obligation as guarantor of IELC's payments to the Trust (which received its rights to the transponders from ICC), Pledger's obligations to ICC would be set off by Integrated's guaranty of IELC's payments to the Trust where ICC, the payee of Pledger's payments, was a mere instrumentality of Integrated. Therefore, Pledger, unlike the Emershaws, could never be the payor of last resort.

In sum, even if IELC became insolvent, the Pledgers would never suffer any financial losses as a result of debts owed to ICC because Integrated had guaranteed IELC's obligations. As ICC was essentially the same company as Integrated, any debts that Pledger owed to ICC would be canceled out by Integrated's promise to cover the payments IELC owed to Pledger through the Trust. Consequently, the outcome of this case turns upon our review of the magistrate judge's decision regarding whether ICC was merely an instrumentality of Integrated.

## B. Relationship Between Parent and Subsidiary

We review a lower court's factual findings for clear error and its legal conclusions de novo. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). As a general matter, we do not find the factual determinations of a lower court to be clearly erroneous unless we are "left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (quotation omitted). When reviewing for clear error, we cannot substitute our judgment for that of the lower court but rather must uphold the lower court's account of the evidence if it "is plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574. Indeed, "[w]here there are two permissible views of

the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.

In this case, the Trust documents require that we look to New York law in determining the relationship between ICC and Integrated. Under New York law, a subsidiary company is not deemed an instrumentality or agent of a parent corporation solely because the parent company owns the subsidiary's stock. *A.W. Fiur Co. v. Ataka & Co.*, 422 N.Y.S.2d 419, 422 (N.Y. App. Div. 1979). To "pierce the corporate veil" and hold a parent company liable for the acts of its subsidiary, we must conclude that the parent company essentially exercised control over the day-to-day operations of its subsidiary such that the subsidiary had become a mere instrumentality of the parent. *Sterling v. Interlake Indus. Inc.*, 154 F.R.D. 579, 587 (E.D.N.Y. 1994) (citing *Billy v. Consol. Mach. Tool Corp.*, 432 N.Y.S.2d 879, 886 (N.Y. 1980)); *see also Pritchard Servs. Inc. v. First Winthrop Props., Inc.*, 568 N.Y.S.2d 775, 776 (N.Y. App. Div. 1991). Although mere ownership does not give rise to instrumentality status, when a parent exercises such control over the subsidiary that it essentially uses the subsidiary for its own purposes, instrumentality is found. *See Sterling*, 154 F.R.D. at 587-88. "The determinative factor is whether the subsidiary corporation is a dummy for the parent corporation." *A.W. Fiur*, 422 N.Y.S.2d at 422; *see also Pritchard*, 568 N.Y.S.2d at 776.

In determining whether a subsidiary is merely an instrumentality of its parent, the factfinder should consider the following factors: "(1) the absence of corporate formalities . . . (2) inadequate capitalization; (3) whether funds are transferred to the parent for the parent's use; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of the corporate entities; (6) the amount of business discretion displayed by the allegedly dominated company; (7) whether the corporations deal with each other at arms length; (8) whether the allegedly dominated corporation is treated as an independent profit center; (9) the payment of debts and