STRANCH, Circuit Judge,
dissenting.
The majority opinion today overturns a decision in which the district court conducted a 10-day bench trial considering the testimony of more than 20 witnesses, including at least 8 experts. It ultimately penned 120 pages dismissing all of Plaintiffs’ challenges to S.B. 238 except its elimination of Golden Week (reducing early in-person (EIP) voting and eliminating same day registration (SDR)), which it enjoined. In reversing this decision, the majority opinion employed an incorrect standard of review and created and applied new tests, unadorned by precedent, instead of those that we and our sister Circuits have found applicable to voter denial cases such as this one. I therefore respectfully dissent.
Before addressing the governing law in light of the extensive record before us, I need to address the assumptions that frame the majority’s opinion. This case is portrayed as an improper intrusion of the federal courts “as overseers and micro-managers, in the minutiae of state election processes.” (Maj.Op. at 622) I disagree. In Veasey v. Abbott, 830 F.3d 216, 279-80, 2016 WL 3923868, at *44 (5th Cir. July 20, 2016) (en banc) (Higginson, J., concurring), the Fifth Circuit provides a fitting answer to this charge. It explains why it is healthy to scrutinize the river of State voting regulations that has flowed in the wake of Shelby County v. Holder, — U.S. -, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013): “Such scrutiny should be seen not as heavy-handed judicial rejection of legislative priorities, but as part of a process of "harmonizing those priorities with the fundamental right to vote — a topic with which over a quarter of our Constitution’s amendments have dealt in one way or another, and an individual right that cannot be compromised because an adverse impact falls on relatively few rather than many.”
This explanation grows from advances in both our social and legal systems. Take the example of states that required literacy tests to vote, a practice our Supreme Court refused to challenge the “wisdom” of in the 1950s, on the basis that, “Literacy and intelligence are obviously not synonymous. Illiterate people may be intelligent voters. Yet in our society where newspa *641 pers, periodicals, books, and other printed matter canvass and debate campaign issues, a State might conclude that only those who are literate should exercise the franchise.” Lassiter v. Northampton Cty. Bd. of Elections, 360 U.S. 45, 50-53, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). By the 1960s, the Court recognized that “[w]hen a State exercises power wholly with in the domain of State interest, it is insulated from Federal judicial review. But such insulation is not carried over when State power is used as an instrument for circumventing a federally protected right.” Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In 1965, the men and women the American people elected to Congress passed the Voting Rights Act (VRA) expressly providing for oversight of state voting regulations and outlawing literacy tests. Testimony by Attorney General Nicholas Katzenbach during the passage of the Act explained why:
Whether there is really a valid basis for the use of literacy tests is ... subject to legitimate question. But it is not for this reason that the proposed legislation seeks to abolish them in certain places. Rather, we seek to abolish these tests because they have been used in those places as a device to discriminate against Negroes ...
Our concern today is to enlarge representative government. It is to solicit the consent of all the governed. It is to increase the number of citizens who can vote. What kind of consummate irony would it be for us to act on that concern — and in so doing reduce the ballot, to diminish democracy? It would not only be ironic; it would be intolerable.
Voting Rights: Hearings on H.R. 6k00 Before the H. Comm, on the Judiciary, 89th Cong. 16-17 (1965) (statement of Nicholas deB. Katzenbach, Attorney General of the . United States).
Our social and legal advances as a society are reflected in the Supreme Court’s decisions during the 1960s that accepted a searching review and scrutiny of voting regulation as necessary. “The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race.” Allen v. State Bd. of Elections, 393 U.S. 544, 565, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Following the 1982 amendments to the VRA, the Court explained both the fullness of the review required and the reason why such scrutiny is essential:
The need for such “totality” review springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power, McCain v. Lybrand, 465 U.S. 236, 243-246[, 104 S.Ct. 1037, 79 L.Ed.2d 271] (1984), a point recognized by Congress when it amended the statute in 1982: “[S]inee the adoption of the Voting Rights Act, [some] jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices that dilute minority voting strength,” Senate Report 10 (discussing § 5). In modifying § 2, Congress thus endorsed our view in White v. Regester, 412 U.S. 755[, 93 S.Ct. 2332, 37 L.Ed.2d 314] (1973), that “whether the political processes are ‘equally open’ depends upon a searching practical evaluation of the ‘past and present reality,’ ” Senate Report 30 (quoting 412 U.S. at 766, 770, 93 S.Ct. 2332).
Johnson v. De Grandy, 512 U.S. 997, 1018, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994).
As numerous cases recognize, those who seek to discriminate against a segment of the population do not trumpet their intentions — or do not do so publicly. The 2006 amendments to the VRA identified our progress as well as this continuing prob *642 lem, noting that “vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process.” H.R. Rep. No. 109-478, at 2 (2006), as reprinted in 2006 U.S.C.C.A.N. 618.
While our case law has struggled to articulate how judges can practically and should appropriately review state laws governing the fundamental right to vote, we have steadily progressed beyond a standard that refused to review the wisdom of a State’s choice to employ procedures, such as literacy tests, that function to disenfranchise selected voters. I do not think that it is federal intrusion or micromanaging to evaluate election procedures to determine if discrimination lurks in an obvious rule or in a subtle detail. Our recent jurisprudence does not shy away from the scrutiny that is essential to protection of the fundamental right to vote, though it recognizes the difficulty of the task. “Rather than applying any ‘litmus test’ that would neatly separate valid from invalid restrictions, we concluded that a court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the ‘hard judgment’ that our adversary system demands.” Crawford v. Marion County Election Bd., 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008). I turn to the case before us to explain why my view of the hard judgment here differs from that of my colleagues.
I. DISTRICT COURT RECORD AND DECISION
I begin with the extensive record made in the district court. The court evaluated evidence provided by both expert and lay witnesses over a ten day trial and found that the “reduction in overall time to vote w[ould] burden the right to vote of African Americans, who use EIP voting significantly more than other voters” (R. 117, PagelD 6161), “specifically during Golden Week.” (id. at 6160) It ultimately held that S.B. 238’s “elimination of Golden Week imposes a modest burden — which the Court defines as a more than minimal but less than significant burden — on the right to vote of African Americans.” (R. 117, PagelD 6156-57) For example, an expert analysis of individual level data based on census blocks within three of the largest counties in Ohio — which contain nearly two-fifths of the state’s minority population — found that “the rate which African Americans used EIP voting in 2010 and 2014 was slightly higher than the white rate,” (id. at 6159) and that the “usage rates of Golden week specifically were far higher among African Americans than among whites in both 2008 and 2012.” (Id.) The Golden Week usage rates in 2008 for 100% homogeneous black census blocks was 3.514 times higher than 100% white blocks. (Id.) In 2012, the Golden Week usage rate was 5.186 times higher for homogeneous black blocks. (Id.) The district court also noted the expert evidence that African Americans are “more likely to be subject to economic, transportation, time, and childcare constraints that increase the cost of voting.” (Id. at 6162) “[Rjelative to whites,” the district court found, “African Americans in Ohio are less likely to work in professional and managerial jobs; are more likely to work in service and sales jobs, including hourly wage jobs; have lower incomes; are nearly three times more likely to live in poverty; and are more than two and a half times more likely to live in a neighborhood in which more than 20% of the residents are in poverty.” (Id.)
The court’s review of the record evidence evincing these disparities led it to conclude
that the cost of voting is therefore generally higher for African Americans, as they are less likely to be able to take time off of work, find childcare, and *643 secure reliable transportation to the polls. Moreover, greater levels of transience may result in more frequent changes of address, which in turn requires individuals to update their registration more frequently. SDR [same-day registration] provided an opportunity to do so and vote at the same time. As such, African Americans disproportionately make up the group that benefits the most from SDR, and the elimination of that opportunity burdens their right to vote.
(Id. at PagelD 6163-64) The district court relied on this evidence and numerous other expert reports and testimony from lay witnesses that it found credible to support its conclusions that the reduction in EIP voting time, and the elimination of Golden Week specifically, imposes a modest burden on the right to vote of African Americans citizens of Ohio.
A great deal of work underlies the district court’s conclusion on this important subject. Both that work and the substantial support found in the record stand in opposition to the majority opinion’s blithe assertion “that it’s easy to vote in Ohio. Very easy, actually.” (Maj.Op. at 10) This assertion is problematic for another reason — the district court’s finding that Ohio law imposes some burden on the right of African Americans to vote in Ohio indicates that how “easy” it is to vote under Ohio’s new regime bears some small but definable relationship to the color of your skin. This burden is the fact-bound conclusion that we address on appeal.
I begin my analysis of the appropriate tests and application to the facts from the record with the equal protection claim.
II. EQUAL PROTECTION
This analysis must start with the correct standard of review. The majority argues that de novo review applies to the district court’s conclusion that elimination of Golden Week imposes a “modest” burden on the right of African American’s to. vote. (Maj. Op. at 628) Neither our precedent nor that of our sister Circuits supports this argument.
In Obama for America v. Husted, 697 F.3d 423, 431 (6th Cir. 2012) (OFA), we applied clear error review to a district court’s determination that an Ohio law restricting early in-person voting placed a “burden on Plaintiffs [that] was ‘particularly high’ because their members, supporters, and constituents represent a large percentage of those who participated in early voting in past elections.” We held that “[b]ased on the evidence in the record, this conclusion was not clearly erroneous.” Id. OFA involved an appeal from a district court’s grant of a preliminary injunction and, accordingly, we reviewed the court’s legal conclusions de novo and its factual determinations for clear error. See id. at 428. The same standard applies where, as here, a party appeals following a bench trial. See Pressman v. Franklin Nat’l Bank, 384 F.3d 182, 185 (6th Cir. 2004). Consequently, it is clear error review we must apply to the district court’s finding that the elimination of Golden Week imposes a more than minimal but less than significant burden on African Americans’ right to vote in Ohio. See OFA, 697 F.3d at 431; see also Ohio State Conference of the NAACP v. Husted, 768 F.3d 524, 532-37 (6th Cir. 2014) [hereinafter “NAACP”] (reviewing for clear error district court’s determination that reductions in early voting would disproportionately and negatively impact African Americans), vacated on other grounds by No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014).
The majority opinion cites four cases to support its proposed substitution of de novo review. None of those cases governs here. The first, Bright v. Gallia County, 753 F.3d 639, 652 (6th Cir. 2014), was an *644 appeal from a district court’s dismissal of a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), which is a procedural posture that calls for de novo appellate review. Bright was not a voting case, or even an election law ease, and its procedural posture makes its standard inapplicable here. Thus, it does not stand for the proposition that the district court’s post-trial, fact-bound finding regarding the burden S.B. 238 places on African Americans’ right to vote is subject to de novo review. The remaining three cases, Williams v. Mehra, 186 F.3d 685, 689 (6th Cir. 1999) (en banc); Libertarian Party of Ohio v. Blackwell, 462 F.3d 579, 583 (6th Cir. 2006), and Green Party of Tennessee v. Hargett, 767 F.3d 533, 542 (6th Cir. 2014), are similarly inapposite. These cases were appeals from summary judgment orders rendering them subject to de novo appellate review. Libertarian Party and Green Party, moreover, concerned associational rights — specifically, ballot access — not the right to vote. See Libertarian Party, 462 F.3d at 585 (“[W]e are cognizant that ‘the state laws place burdens on two different, although overlapping, kinds of rights — the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.’ ” (quoting Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968))); Green Party, 767 F.3d at 545 (recognizing that while “[ajssocia-tional rights and voting rights are closely connected ... [sjtill, states may impose reasonable restrictions on ballot access”). Libertarian Party firmly grounded its burden analysis in the associational rights context, explaining that “[t]he key factor in determining the level of scrutiny to apply is the importance of the associational right burdened[,]” 462 F.3d at 587, and Green Party in turn relied on that analysis, see 767 F.3d at 547 (citing id.).
None of the cases cited by the majority dictates our standard of review here. Rather, as in OFA (and NAACP), we are limited to reviewing for clear error the district court’s finding based on record evidence that S.B. 238’s “elimination of Golden Week imposes a modest burden — which the Court defines as a more than minimal but less than significant burden — on the right to vote of African Americans.” (R. 117, PagelD 6156-57). Our sister Circuits agree. The Fourth and Fifth Circuits have applied clear error review to the findings made by district courts in similar challenges under the Fourteenth Amendment and Section 2 of the Voting Rights Act.[1] See N.C. State Conference of NAACP v. McCrory, 831 F.3d 204, 219-20, 2016 WL 4053033, at *6 (4th Cir. July 29, 2016) (applying clear error review to the “ultimate factual question” of a legislature’s discriminatory motivation); Veasey v. Abbott, 831 F.3d at 219-20, 2016 WL 3923868, at *5 (applying clear error review to district court’s finding that a Texas voter ID law violated the Fourteenth Amendment and Section 2 of the Voting Rights Act). “In reviewing the district court’s findings for clear error, we may not substitute our judgment for that of the district court and ‘must uphold the [district] court’s account of the evidence if it ‘is plausible in light of the record viewed in its entirety.’ ” Lee v. Willey, 789 F.3d 673, 680 (6th Cir. 2015) (alteration in original) (quoting Pledger v. United States, 236 F.3d 315, 320 (6th Cir. 2000)).
Applying the correct standard reveals that the district court’s finding of a modest *645 burden under the Anderson-Bwrdick test is more than plausible — it is well-supported by the record. (See R. 117, PagelD 6153-70) The district court extensively reviewed and relied upon expert and anecdotal evidence in the record before concluding that “this evidence of the effects of the reduction in EIP voting days and the elimination of SDR demonstrates that S.B. 238 imposes a modest, as well as a disproportionate, burden on African Americans’ right to vote.” (Id. at PagelD 6164; see also id. at 6156-57)
In arguing under the standard it proposes, the majority seeks to rely on voting systems in other states as an important “contextual basis” (Maj.Op. at 629) for determining whether the burden of S.B. 238 falls disproportionately on African Americans. But the usefulness of that contextual information depends on whether the many variable methods for voting in each system line up. Certain types of voting processes, like early voting, “do[] not necessarily play the same role in all jurisdictions in ensuring that certain groups of voters are actually able to vote” and as a result, “the same law may impose a significant burden in one state and only a minimal burden in the other.” NAACP, 768 F.3d at 546. Simply stating that Ohio’s early voting system is “one of the more generous in the nation” (Maj.Op. at 628) provides little helpful information. It fails, for example, to account for the rate at which early voting is actually used by different populations, let alone how the voting options in other states might impact the comparison. In most respects, this issue is local and dependent on the particular circumstances of Ohio’s law and its population. Analysis of the burden that S.B. 238 places on Ohio voters thus necessarily entails engaging with the factual record. The majority opinion fails to perform that essential work.
The majority opinion next seeks to recast African American voters’ reliance on EIP and SDR as mere “personal preference.” (Maj.Op. at 630) This is based on surmise, not record evidence. So, too, is its conclusory assertion that “[a]t worst,” the elimination of Golden Week “represents a withdrawal or contraction of just one of many conveniences that have generously facilitated voting participation in Ohio.” (Id. at 628) The record in this case shows that the State of Ohio instituted no fault early voting in 2005 not as a generous convenience but as a necessary tool “to remedy the manifold problems experienced during the 2004 election,” (R. 117, PagelD 6156) “including extremely long lines at the polls” and other “election administration problems.” (Id. at 6144) As the Fourth Circuit recently concluded in a similar vote denial case and as this record supports, “socioeconomic disparities establish that no mere ‘preference’ led African Americans to disproportionately use early voting! and] same-day registration!.]” McCrory, 831 F.3d at 233, 2016 WL 4053033, at *17. “Registration and voting tools may be a simple ‘preference’ for many white [voters],” the Fourth Circuit recognized, “but for many African Americans they are a necessity.” Id.
The majority opinion again relies on assumptions about voting preferences to conclude that the record evidence that African Americans use early voting at higher rates than other voters may make them “theoretically disadvantaged” (Maj.Op. at 631) by reductions in early voting. There is nothing theoretical about the disadvantage found by the district court. Using an extensive record, the district court determined that S.B. 238’s changes to early voting and same day voter registration impose a modest and disproportionate burden on African Americans’ right to vote. The majority points to no clear error by the district court on the record. I would *646 affirm its finding because it satisfies the correct standard of review.
The majority opinion, however, rejects the district court’s decision that S.B. 238 imposes a “modest” burden and, based on its chosen standard of de novo review, concludes that it is a “minimal burden.” (Maj.Op. at 628-80) Building on that error, it applies a deferential standard of review akin to rational basis and presumes that Crawford both applies and resolves this case. (Maj.Op. at 630-32)
This series of conclusions relies on standards of review not applicable to this case. First, Crawford arose in a different context because it was an appeal from a summary judgment order, not a bench trial. Second, the case is factually distinct in essential ways because there the Court “held only that the lower courts ‘correctly concluded that the evidence in the record [was] not sufficient to support a facial attack on the validity of the entire statute’ under the constitutional Anderson-Burdick framework.” Veasey v. Abbott, 830 F.3d at 274, 2016 WL 3923868, at *41 (Higginson, J., concurring) (alterations in original) (quoting Crawford, 553 U.S. at 189, 128 S.Ct. 1610). Crawford concerned a facial challenge to a voter identification law, but the summary judgment record in that case “(1) did not quantify the voters without qualifying ID, (2) provided no ‘concrete evidence of the burden imposed on voters who currently lack photo identification,’ and (3) said ‘virtually nothing about the difficulties faced by ... indigent voters.’ ” Id. (alteration in original) (quoting Crawford, 553 U.S. at 200-01, 128 S.Ct. 1610). In other words, “[t]he petitioners in Crawford had not presented any evidence in the record that even estimated the number of individuals who lacked identification cards. Nor did the affidavits or depositions in the record of lower-income individuals or elderly voters in Crawford substantiate that they in fact faced difficulties in obtaining identification cards.” NAACP, 768 F.3d at 544 (citation omitted). Thus, “on the basis of the record that ha[d] been made in th[at] litigation,” the Court could not “conclude that the statute impose[d] excessively burdensome requirements.” Crawford, 553 U.S. at 202, 128 S.Ct. 1610.
Here, by contrast, the record is replete with specific evidence supporting the plaintiffs’ claims and the district court’s conclusion regarding the amount of burden imposed by the elimination of Golden Week. (See R. 117, PagelD 6153-70) Over the course of a ten day bench trial, the district court weighed evidence from eight expert witnesses and nineteen lay witnesses, from statistical analyses to testimony of Get Out the Vote efforts, ultimately making determinations of credibility that led to its conclusion that S.B. 238 disproportionately burdens African Americans. (See id. at 6128-44) The record in this case provides ample evidence by which the district court could “quantify ... the magnitude of the burden” on African American voters. Crawford, 553 U.S. at 200, 128 S.Ct. 1610. I would also affirm the district court’s application of Anderson-Burdick balancing and the court’s resulting conclusion that the State has failed to present sufficient evidence to show that its specific (as opposed to abstract) interests justify the burden that eliminating Golden Week imposes on African American voters. (See R. 117, PagelD 6170-79)
The majority opinion argues that the overarching question with respect to plaintiffs’ equal protection claim in this case is whether Ohio may experiment with expanding and contracting voting regulations. Of course it may. The question is whether it may do so in a way that disparately impacts a protected group without sufficient justification by a relevant and legitimate' state interest. Because I agree with the district court that Ohio’s revised *647 S.B. 238 improperly burdens the right to vote of African American citizens of Ohio and constitutes a violation of equal protection, I respectfully dissent.
III. THE VOTING RIGHTS ACT
The majority acknowledges the test for vote denial claims under Section 2 of the VRA that we laid out two years, ago in NAACP but suggests that it warrants clarification. (Maj.Op. at 636-38) This clarification, however, leads it to apply an inappropriately strict threshold for Section 2 claims. I would remain faithful to our original NAACP framework, as adopted and applied by the Fourth and Fifth Circuits, and as correctly applied by the district court.
NAACP concerned a plaintiffs request for a preliminary injunction in advance of the 2014 election, and was vacated as moot following that election. See Ohio State Conference of the NAACP v. Husted, No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014). Nonetheless, it remains persuasive authority, that has been subsequently adopted by another panel of this court. See Mich. State A. Philip Randolph Inst. v. Johnson, 833 F.3d 656, 666-67 n.2, 2016 WL 4376429, at *7 n.2 (6th Cir. Aug. 17, 2016). Drawing on the text of Section 2 itself and the guidance in Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), NAACP laid out a two-part framework for assessing vote-denial claims: first, “the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect' representatives of their choice,” and second, “that the burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.” NAACP, 768 F.3d at 544 (quotation marks omitted). In NAACP, this court also explicitly found the nine factors laid out in Gingles to be relevant to the second part of this analysis and encouraged their consideration. Id.
Both the Fifth Circuit sitting en banc and the Fourth Circuit have adopted and applied our NAACP test in full. See Veasey, 830 F.3d at 243^4, 2016 WL 3923868, at *17 (“We now adopt the two part framework employed by the Fourth and Sixth-Circuits to evaluate Section 2 ‘results’ claims.”); League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 240-41 (4th Cir. 2014) (adopting Sixth Circuit test for Section 2 vote-denial claims). These courts acknowledged that Section 2 jurisprudence had primarily developed in the vote-dilution context and a clear standard for vote-denial claims had not previously been settled. Then both explicitly adopted NAACP's two-part framework and incorporated the Gingles, factors. See Veasey, 830 F.3d at 245-46, 2016 WL 3923868, at *18 (“As did the Fourth and Sixth Circuits, we conclude that the Gingles factors should be used to help determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination.”); League of Women Voters of N.C., 769 F.3d at 240 (“These [Gingles] factors may shed light on whether the two elements of a Section 2 claim are met.”).
The Ninth and Eleventh Circuits have also expressed approval for considering the Gingles factors in the vote-denial context. See, e.g., Gonzalez v. Arizona, 677 F.3d 383, 405-06 (9th Cir. 2012) (en banc) (explaining that “courts should consider” the Gingles factors in vote-denial cases); Johnson v. Governor of Fla., 405 F.3d 1214, 1227 n.26 (11th Cir. 2005) (recognizing that the Gingles factors apply to vote-denial cases); Smith v. Salt River Project Agric. Improvement & Power Dist., 109 *648 F.3d 586, 596 n.8 (9th Cir. 1997) (rejecting the argument that the Gingles factors “apply only to Vote dilution’ claims”).
The district court acknowledged that the vacated opinion in NAACP was not “binding,” but that nonetheless, it was “free to find the reasoning therein persuasive” (R. 117, PagelD 6152.) I agree. The two-part framework as articulated in NAACP is both reasonable and appropriate to use when evaluating a Section 2 vote-denial claim, and the district court did not err in its decision to do so here, or in its application.
The Supreme Court has repeatedly instructed that “[t]he Voting Rights Act was aimed at the subtle, as.well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race,” Allen v. State Bd. of Elections, 393 U.S. 544, 565, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), and “should be interpreted in a manner that provides ‘the broadest possible scope’ in combating racial discrimination,” Chisom v. Roemer, 501 U.S. 380, 403, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (quoting Allen, 393 U.S. at 567, 89 S.Ct. 817). “The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.” Gingles, 478 U.S. at 47, 106 S.Ct. 2752.
The Senate Report accompanying the 1982 amendments to the VRA “emphasize^] repeatedly” that the “ ‘right’ question” in a Section 2 analysis is “whether ‘as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.’ ” Id. at 44, 106 S.Ct. 2752 (quoting S. Rep. No. 97-417, at 28 (1982) [hereinafter S. Rep.], as reprinted in 1982 U.S.C.C.A.N. 177, 206). Answering this question requires a court to “assess the impact of the contested structure or practice on minority electoral opportunities ‘on the basis of objective factors.’ ” Gingles, 478 U.S. at 44, 106 S.Ct. 2752 (citing S. Rep. at 27, 1982 U.S.C.C.A.N. at 205). Gingles noted a set of enumerated factors that will “often be pertinent to certain types of § 2 violations, particularly to vote dilution claims,” but neither the Report nor the Court have limited their application to such. Gingles, 478 U.S. at 45, 106 S.Ct. 2752. I agree with our prior precedent and the Fourth, Fifth, Ninth and Eleventh Circuits that the Gingles factors can and “should be used to help determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination.” Veasey, 830 F.3d at 245, 2016 WL 3923868, at *19.
Rather than following the Supreme Court’s guidance to interpret the VRA with the “broadest possible scope,” 501 U.S. at 403, 111 S.Ct. 2354, the majority adds to the first part of NAACP a narrow threshold inquiry, thereby allowing it to brush aside the district court’s analysis of the Gingles factors in the second part of the NAACP framework. The majority creates a test that requires as a threshold step “proof that the challenged standard or practice causally contributes to the alleged discriminatory impact.” (Maj.Op. at 23) This extra requirement is unnecessary. As the text of Section 2 states, a voting standard or practice may only be invalidated under Section 2 if it results in less opportunity for members of a protected class to participate in the political process than others. See 52 U.S.C. § 10301. The existing test is true to this text and contains the necessary causal linkage between an electoral regulation and its interaction with social and historical conditions. The second part of the NAACP analysis addresses whether the law interacts with social and historical conditions to cause a *649 disparate burden. See Veasey, 830 F.3d at 243-44, 2016 WL 3923868, at *17. The Gingles factors provide context and guidance for whether the causal link between the disparate burden and the social and historical conditions produced by discrimination is sufficient ■ to show a Section 2 violation. See id. at 245-46, 2016 WL 3923868 at *18. The inquiry is “flexible [and] fact-intensive,” and requires an examination of the record evidence. Gingles, 478 U.S. at 46, 106 S.Ct. 2752. Both parts of the proper framework were mirrored in the district court’s application below, and by the Fourth and Fifth Circuits when they adopted our framework. See Veasey, 830 F.3d at 249-66, 2016 WL 3923868, at *21-*33; League of Women Voters of N.C., 769 F.3d at 241 (“Clearly, an eye toward past practices is part and parcel of the totality of the circumstances.”)
In finding that S.B. 238 imposes a disparate burden on African Americans, the district court referred to the evidence used in its Equal Protection Clause analysis showing that the law “results in less opportunity for African Americans to participate in the political process than other voters.” (R. 117, PagelD 6220) This evidence, based on expert analysis as well as lay witness testimony, showed that African Americans utilize EIP voting in higher rates, face higher costs of voting, and disproportionately make up the group that benefits the most from SDR. (Id. at 6158-64) The district court found that together, the reduction of EIP and the elimination of SDR would impose a “modest, as well as a disproportionate, burden on African Americans’ right to vote.” (Id. at 6164)
The majority dismisses this conclusion as “hasty,” (Maj.Op. at 638-39) and once again refuses to accept the factual findings made by the district court. Instead, the majority selects .two items from the record to support its conclusion that the political process in Ohio is “equally open to African Americans,” (id.) including a reference to a rebuttal report by Defense expert Dr. Hood. In so doing, the majority ignores the credibility determinations made by the district court, particularly regarding the statistical evidence provided by Plaintiffs’ expert Dr. Timberlake which strongly suggested higher usage rates of EIP and SDR by African Americans. The district court, as fact finder, weighed the evidence provided by these experts, and others, ultimately determining that Timberlake’s conclusions were credible (R. 117, PagelD 6132) and affording “little weight” to opinions in Hood’s report because of its reliance on statements by declarants selected and questioned by defense counsel who Hood never personally questioned and whose declarations he did not confirm with hard data. (Id. at 6138)
The majority says that the statistical evidence “runs directly contrary” (Maj.Op. at 639) to the district court’s conclusions, and that such evidence “rather clearly shows” (id.) that S.B. 238 does not have a disparate impact on African American participation. The majority does not, however, provide support in the record for what statistical evidence it relies on for these statements, or precisely how they run contrary to the district court’s conclusions. While dismissing the district court’s conclusion that S.B. 238 would have a disparate impact on African Americans as “speculative,” the majority fails to account for the speculation in its own substitution. I would affirm the district court’s determination that the record reflects the imposition of a disproportionate burden on African Americans’ right to vote.
I would also hold that the district court’s analysis of the second step of the Section 2 framework, including its application of the Gingles factors, was proper. The court found that the plaintiffs had established factors one, two, three, five, and nine, and *650 that factors five and nine were particularly relevant. (See R. 117, PagelD 6224-28) Factor five assesses “[t]he extent to which members of the minority group ... bear the effects of discrimination in areas such as education, employment and health, which hinder their ability to participate effectively in the political process.” Gin-gles, 478 U.S. at 45, 106 S.Ct. 2752. The district court determined that the plaintiffs had “adduced evidence indicating that African Americans in the state of Ohio bear the effects of discrimination in areas such as employment and education.” (R. 117, PagelD 6226) In coming to this conclusion, the court weighed evidence indicating that, relative to whites, African Americans are “less likely to work in professional and managerial jobs, are more likely to work in service and sales jobs, including hourly wage jobs; have lower incomes; are nearly three times more likely to live in poverty” and are more likely to live in neighborhoods where others live in poverty. (R. 117, PagelD 6162) The court found this evidence, based on Timberlake’s expert testimony and considered against Hood’s report, credible. (See id. at 6134, 6163, 6226)
Factor nine assesses the tenuousness of the policies underlying the law. Gingles, 478 U.S. at 45, 106 S.Ct. 2752. The district court determined that the “justifications offered in support of the elimination of Golden Week,” including preventing voter fraud or confusion, reducing costs and administrative burdens, and increasing voter confidence, “were either not supported by evidence or did not withstand logical scrutiny.” (R. 117, PagelD 6228) The State’s asserted interests are legitimate, and Ohio is “entitled to make policy choices about when and how it will address various priorities.” Veasey, 830 F.3d at 263, 2016 WL 3923868, at *31; see also Crawford, 553 U.S. at 191, 128 S.Ct. 1610. But where the district court has credited testimony showing “very limited” or “minimal” evidence to actually connect these justifications with the enacted law, the assertion of even legitimate-interests may not automatically win the day. (R. 117, PagelD 6172, 6174) Determining whether the political process is “equally open” to all voters requires a “searching practical evaluation of the past and present reality and ... a functional view of the political process.” Gingles, 478 U.S. at 45, 106 S.Ct. 2752. The district court performed such an inquiry.
Based on its findings that S.B. 238 imposes a disproportionate burden on African Americans, and that the law was linked to social and historical conditions of discrimination that diminish the ability of African Americans to participate in the political process, the district court concluded that S.B. 238 has a discriminatory effect in violation of Section 2 of the Voting Rights Act. I would hold that the district court properly applied our preexisting test for Section 2.
IV. CONCLUSION
I would affirm the very limited injunction issued by the district court on the basis that S.B. 238’s elimination of Golden Week, reducing early in-person voting and same day registration, is a violation of equal protection and Section 2 of the Voting Rights Act of 1965. The district court applied the correct constitutional and statutory tests and its decision is fully supported by the extensive record resulting from its ten day bench trial. The charge that this appeal — and apparently many others — intrude upon the right of the states to run their own election process is both unfounded and antiquated. Our American society and legal system now recognize that appropriate scrutiny is essential to protection of the fundamental right to vote. The scrutiny applied by the district court was proper and in accord *651 with governing precedent. I therefore respectfully dissent.

. In addressing a claim similar to our own, the Seventh Circuit was not specific about the standard of review, instead faulting the district court for failing to make adequate findings then resolving the case as indistinguishable from Crawford and thus controlled by it. See Frank v. Walker, 768 F.3d 744, 751 (7th Cir. 2014).